(Slip Opinion) OCTOBER TERM, 2023 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PULSIFER *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 22–340.   Argued October 2, 2023—Decided March 15, 2024

After pleading guilty to distributing at least 50 grams of methamphetamine, petitioner Mark Pulsifer faced a mandatory minimum sentence of 15 years in prison.  At sentencing, he sought to take advantage of the "safety valve" provision of federal sentencing law, which allows a sentencing court to disregard the statutory minimum if a defendant meets five criteria.  Among those is the requirement, set out in Paragraph (f)(1), that the sentencing court find that—

    (1) the defendant does not have—

    (A)  more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;

    (B)  a prior 3-point offense, as determined under the sentencing guidelines; and

    (C)  a prior 2-point violent offense, as determined under the sentencing guidelines.

The Government argued that Pulsifer could not satisfy that requirement because he had two prior three-point offenses totaling six criminal-history points.  In the Government's view, each of those prior offenses disqualified him under Subparagraph B and the six total points disqualified him under Subparagraph A.  But Pulsifer claimed he remained eligible.  He pointed out that his criminal record lacked a two-point violent offense, as specified in Subparagraph C.  And in his view, only the combination of the items listed in the subparagraphs could prevent him from getting safety-valve relief.  The District Court agreed with the Government, and the Eighth Circuit affirmed.

*Held*: A defendant facing a mandatory minimum sentence is eligible for safety-valve relief under 18 U. S. C. §3553(f)(1) only if he satisfies each

of the provision's three conditions—or said more specifically, only if he does not have more than four criminal-history points, does not have a prior three-point offense, and does not have a prior two-point violent offense. Pp. 6–28.

(a) Each party offers a grammatically permissible way to read Paragraph (f)(1). Under Pulsifer's reading, the word "and" joins three features of a defendant's criminal history into a single disqualifying characteristic; accordingly, a defendant is ineligible for the safety valve only if he has the items listed in Subparagraphs A, B, and C in combination. In the Government's view, "and" connects three criminal-history conditions, all of which must be satisfied to gain safety-valve relief. In other words, the court must find the defendant does not have A, does not have B, and does not have C. Each of those readings is possible in the abstract. The choice between the two can sensibly be made only by examining the content of Paragraph(f)(1)'s three subparagraphs, including what they say, how they relate to each other, and how they fit with other pertinent law. Pp. 6–15.

(b) The text and context of Paragraph (f)(1), as read against the Guidelines, yield just one plausible statutory construction. The paragraph creates an eligibility checklist, and specifies three necessary conditions for safety-valve relief. Reading the paragraph as Pulsifer does to set out a single condition—*i.e.,* that the defendant not have the *combination* of the characteristics listed in Subparagraphs A, B, and C—would create two statutory difficulties that the Government's reading does not. Pp. 15–23.

(1) Pulsifer's reading would render Subparagraph A superfluous because a defendant who has a three-point offense under Subparagraph B and a two-point offense under Subparagraph C will always have more than four criminal-history points under Subparagraph A. That reading leaves Subparagraph A with no work to do: removing it from the statute would make the exact same people eligible (and ineligible) for relief. That kind of superfluity, in and of itself, refutes Pulsifer's reading. When a statutory construction "render[s] an entire subparagraph meaningless," this Court has noted, the canon against surplusage applies with special force. *National Assn. of Mfrs.* v. *Department of Defense*, 583 U. S. 109, 128. That is particularly true when, as here, the subparagraph is so evidently designed to serve a concrete function. Pp. 15–20.

(2) Pulsifer's reading would also create a second problem related to Paragraph (f)(1)'s gatekeeping function. The Guidelines presume that defendants with worse criminal records—exhibiting recidivism, lengthy sentences, and violence—deserve greater punishment. Under the Government's reading, Paragraph (f)(1) sorts defendants accord-

ingly. When the defendant has committed multiple non-minor offenses, he cannot get relief (Subparagraph A). And so too when he has committed even a single serious offense punished with a lengthy prison sentence (Subparagraph B) or one involving violence (Subparagraph C). Pulsifer's reading, by contrast, would allow safety-valve relief to defendants with more serious records while barring relief to defendants with less serious ones. A defendant with a three-point offense and a two-point violent offense would be denied relief. But a defendant with multiple three-point violent offenses could get relief simply because he happens not to have a two-point violent offense.

Contrary to Pulsifer's view, that anomalous result cannot be ignored on the ground that a sentencing judge retains discretion to impose a lengthy sentence. If Congress thought it could always rely on sentencing discretion, it would not have created a criminal-history requirement in the first instance. Instead, it specified a requirement that allows such discretion to operate only if a defendant's record does not reach a certain level of seriousness. Pulsifer's construction of Paragraph (f)(1) makes a hash of that gatekeeping function. Pp. 20–23.

(c) The uncontested fact that Congress amended Paragraph (f)(1) as part of the First Step Act to make safety-valve relief more widely available does not assist in interpreting the statutory text here. Both parties' views of the paragraph widen the opportunity for safety-valve relief, and Pulsifer's interpretation is not better just because it would allow more relief than the Government's. "[N]o law pursues its . . . purpose[s] at all costs." *Luna Perez* v. *Sturgis Public Schools*, 598 U. S. 142, 150. Here, where Congress did not eliminate but only curtailed mandatory minimums, the Court can do no better than examining Paragraph (f)(1)'s text in context to determine the exact contours of the defendants to whom Congress extended safety-valve relief. P. 26.

(d) The Court rejects Pulsifer's efforts to invoke the rule of lenity. Lenity applies only when a statute is genuinely ambiguous. For the reasons explained above, although there are two grammatically permissible readings of Paragraph (f)(1), in context its text is susceptible of only one possible construction. That leaves no role for lenity to play. Pp. 27–28.

39 F. 4th 1018, affirmed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, KAVANAUGH, and BARRETT, JJ., joined. GORSUCH, J., filed a dissenting opinion, in which SOTOMAYOR and JACKSON, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 22–340

―――――――

## MARK E. PULSIFER, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[March 15, 2024]

JUSTICE KAGAN delivered the opinion of the Court.

The "safety valve" provision of federal sentencing law exempts certain defendants from mandatory minimum penalties, thus enabling courts to give them lighter prison terms. To qualify for safety-valve relief, a defendant must meet various criteria, one of which addresses his criminal history. That criterion, in stylized form, requires that a defendant "does not have A, B, and C"—where A, B, and C refer to three ways in which past criminality may suggest future dangerousness and therefore warrant a more severe sentence. In brief (with details below), A, B, and C are "more than 4 criminal history points," a "3-point offense," and a "2-point violent offense."

The question presented is how to understand the criminal-history requirement. The Government contends that the phrase "does not have A, B, and C" creates a checklist with three distinct conditions. On that view, a defendant meets the requirement (and so is eligible for safety-valve relief) if he does not have A, does not have B, and does not have C. Or stated conversely, a person fails to meet the requirement (and so cannot get relief) if he has any one of the three. The petitioner here instead contends that the phrase "does not have A, B, and C" sets out a single, amalgamated condition

for relief.  On his reading, a defendant meets the requirement (and is eligible for relief) so long as he does not have the *combination* of A, B, and C.  Or put conversely, he fails to meet the requirement (and cannot get relief) only when he has all three.  Today, we agree with the Government's view of the criminal-history provision.

I

Congress sometimes establishes mandatory minimum penalties for crimes, including drug offenses.  Those provisions put a lower limit on a court's sentencing discretion, reflecting Congress's judgment that specified conduct demands no less than a specified punishment.  For drug offenses of the kind involved here, the existence and length of minimum penalties typically depend on the type and quantity of the drug at issue, the harm resulting from the crime, and (relevant here) the defendant's criminal history.

The safety-valve provision, 18 U. S. C. §3553(f), offers some defendants convicted of drug offenses an escape from otherwise applicable mandatory minimums.  Under the provision, a court is to sentence a defendant "without regard to any statutory minimum" if it finds that five criteria are met.  *Ibid.*  Three of the criteria focus on characteristics of the offense—in brief, whether the defendant used violence; whether the crime resulted in death or serious injury; and whether the defendant acted as a ringleader.  See §3553(f)(2)–(4).  One of the criteria addresses the defendant's cooperation with the Government.  See §3553(f)(5).  And one—the first listed and the most relevant here—concerns the defendant's criminal history.  See §3553(f)(1).  The complete text of the safety-valve provision is set out in this opinion's appendix.

The criminal-history requirement—we usually call it Paragraph (f)(1)—recently underwent a substantial revision, making it easier for a defendant to meet.  As originally

enacted, the paragraph limited safety-valve relief to defendants who "d[id] not have more than 1 criminal history point, as determined under the sentencing guidelines." Violent Crime Control and Law Enforcement Act of 1994, 108 Stat. 1985. What that meant in practice—we explain why just below—was that anything more than a single minor crime barred a defendant from gaining relief. But that is no longer so. In the First Step Act of 2018, Congress relaxed the safety-valve provision's criminal-history requirement, enabling defendants with more significant criminal records to qualify. Pub. L. 115–391, 132 Stat. 5221. Today, Paragraph (f)(1) is met if "the court finds at sentencing" that:

> the defendant does not have—
>     (A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
>     (B) a prior 3-point offense, as determined under the sentencing guidelines; and
>     (C) a prior 2-point violent offense, as determined under the sentencing guidelines.

And if the defendant also meets Section 3553(f)'s other four criteria, he becomes exempt from a statutory minimum.

As the text makes clear, the new Paragraph (f)(1) (like the old one) turns on the defendant's criminal-history points under the Guidelines. In general, the severity of Guidelines sentencing recommendations increases with the number of criminal-history points the defendant has (often called his criminal-history score). And the Guidelines assign more points to more serious prior offenses. There is a caveat to that rule, which will become pertinent later. See *infra*, at 17–20. Some prior convictions, even if for serious offenses, do not add any points to a defendant's score. That is true, for example, if the conviction is quite old or if it was rendered by a foreign court. See U. S. Sentencing Guidelines (USSG) §4A1.2(e)(3), (h). But putting such exceptions

aside, convictions resulting in longer prison sentences add more points to a defendant's total. As previewed above, the Guidelines award one point for minor offenses—specifically, for those resulting in sentences of less than 60 days. In the new Paragraph (f)(1), those minor sentences do not matter at all: Because of the "excluding" phrase, they cannot, either alone or in combination, prevent a defendant from gaining safety-valve relief. But longer sentences, generating more points, fall within the paragraph's notice. A prison sentence of between 60 days and 13 months earns two points under the Guidelines. See §4A1.1(b). So a conviction punished with that sentence will count, for purposes of the paragraph, as a "prior 2-point offense," assuming it is also "violent" (as defined in a nearby provision). §3553(f)(1)(C), (g). Moving up another notch, a sentence exceeding 13 months earns three points under the Guidelines. See §4A1.1(a). So a conviction giving rise to that greater penalty (whether or not violent) will qualify under the paragraph as a "prior 3-point offense." §3553(f)(1)(B).

This case involves a dispute about whether Paragraph (f)(1) bars petitioner Mark Pulsifer from gaining safety-valve relief. Pulsifer pleaded guilty in 2020 to distributing at least 50 grams of methamphetamine. He faced a mandatory minimum of 15 years in prison unless the safety-valve provision came to his aid. The Government claimed it did not because Pulsifer could not meet its criminal-history requirement. Pulsifer had two relevant prior convictions, each for a three-point offense. In the Government's view, that fact disqualified Pulsifer from obtaining relief several times over. He had not just one but two "prior 3-point offense[s]," as specified in Subparagraph B of the requirement. And because three plus three equals six, he also had "more than 4 criminal history points," as specified in Subparagraph A. But Pulsifer claimed that was still not enough. He pointed out that his criminal record lacked a "2-point violent offense," as specified in Subparagraph C.

And in his view, only the combination of the items listed in the three subparagraphs—the full package, as it were—could prevent him from getting safety-valve relief.

The District Court rejected Pulsifer's argument, ruling that a defendant is "ineligible for safety valve" relief if he has any of the "three things" specified in Paragraph (f)(1). App. to Pet. for Cert. 35a–36a. The mandatory minimum, the court concluded, thus applied to Pulsifer's sentence.

The Court of Appeals for the Eighth Circuit affirmed. The court framed the question as "in what sense the statute uses the word 'and.'" 39 F. 4th 1018, 1021 (2022). In the abstract, the court stated, the phrase "the defendant does not have (A), (B), and (C)" might be read in two different ways. It could mean that the defendant does not have the combination of the "three elements listed in (A), (B), and (C)," as Pulsifer urged. *Ibid.* Or it could mean, as the Government argued, that the defendant does not have every one of those elements—in other words, that he does not have (A), does not have (B), and does not have (C). In choosing between those readings, the court found a "strong textual basis" to prefer the Government's. *Ibid.* If Pulsifer were right, the court explained, Subparagraph A would be "rendered superfluous"—without the slightest effect. *Ibid.* "A defendant who has a prior three-point offense under [Subparagraph B] and a prior two-point violent offense under [Subparagraph C] would *always* meet the criterion in [Subparagraph A], because he would always have more than four criminal history points." *Ibid.* That was reason enough to read Paragraph (f)(1) the other way—as an "eligibility checklist" of three distinct conditions, each of which the defendant must meet to qualify for safety-valve relief. *Id.*, at 1022. And on that view, the court concluded, Pulsifer could not escape a mandatory minimum: Because he had a pair of three-point offenses, it was simply "immaterial" that he did not also "have a prior two-point violent offense." *Id.*, at 1022–1023.

We granted certiorari, 598 U. S. ___ (2023), because the Courts of Appeals have split over how to read the safety-valve provision's criminal-history requirement.[1] Today, we adopt the Government's view, and so affirm the decision below. A defendant is eligible for safety-valve relief under Paragraph (f)(1) only if he "does not have" all three of the items listed—or said more specifically, does not have four criminal-history points, does not have a prior three-point offense, and does not have a prior two-point violent offense. The paragraph thus creates an eligibility checklist, and demands that a defendant satisfy every one of its conditions.

## II

We start with Paragraph (f)(1)'s grammatical structure, because Pulsifer's main argument (and initially the dissent's) is that it resolves this case. See Brief for Pulsifer 16–20; *post*, at 7–8 (opinion of GORSUCH, J.).[2] Recall that the paragraph requires a court to find that the defendant does not have the features specified in Subparagraphs A, B, and C. "Because Congress used 'and' to connect" those subparagraphs, Pulsifer contends, "a defendant is ineligible" for safety-valve relief "only if he has the complete combo"— *i.e.*, more than four criminal-history points plus a prior three-point offense plus a prior two-point violent one. Brief for Pulsifer 19. That result follows, Pulsifer claims, simply

---

[1] Compare 39 F. 4th 1018 (CA8 2022) (case below) (holding that a defendant is eligible for relief only if he does not have all three of the items listed); *United States* v. *Palomares*, 52 F. 4th 640 (CA5 2022) (same); *United States* v. *Haynes*, 55 F. 4th 1075 (CA6 2022) (same); *United States* v. *Pace*, 48 F. 4th 741 (CA7 2022) (same), with *United States* v. *Jones*, 60 F. 4th 230 (CA4 2023) (holding that a defendant is eligible for relief so long as he does not have any one of the items listed); *United States* v. *Lopez*, 998 F. 3d 431 (CA9 2021) (same); *United States* v. *Garcon*, 54 F. 4th 1274 (CA11 2022) (en banc) (same).

[2] As later noted, *infra*, at 15, the dissent ultimately comes around to the view that the meaning of Paragraph (f)(1) depends on context, see *post*, at 15–16.

from "what ordinary grammar says." Tr. of Oral Arg. 3. But in fact grammar does not say so much. There are two grammatically permissible ways to read Paragraph (f)(1). Yes, one is Pulsifer's. But the other is the Government's—that a defendant is ineligible for relief unless he can satisfy each of the paragraph's three conditions. The choice between the two, as this Part shows, is not a matter of grammatical rules. It can sensibly be made only by examining, as the next Part does, the paragraph's content, as read in conjunction with the Guidelines. Or, as we usually say in statutory construction cases, by reviewing text in context.

"And," in grammatical terms, is of course a conjunction—a word whose function is to connect specified items. Both parties here agree with that elementary proposition. See Brief for Pulsifer 18; Brief for United States 14. The word "and," each might say, means . . . well, and. Indeed, to the extent elaboration is needed, both parties select the same definition from the same dictionary. "And," they recite in concert, means "along with or together with." Webster's Third New International Dictionary 80 (1993); see Brief for Pulsifer 18; Brief for United States 14.

Where things get more complicated is in figuring out what goes along or together with what—or otherwise said, what the "and" in Paragraph (f)(1) connects. As Pulsifer reads the paragraph, the "and" joins three features of a defendant's criminal history into a single disqualifying characteristic. The conjunction of Subparagraphs A, B, and C produces the thing he labels "the complete combo"; the question then becomes whether the defendant has or "does not have" that full package. Brief for Pulsifer 19; §3553(f)(1). Some grade-school math notation may help reveal the proposed ordering. It is as if Pulsifer inserted parentheses into the paragraph, so that it asks whether "the defendant does not have (A, B, and C)." Much as a student would solve "5 - (2 + 1)" by first adding 2 and 1 and then subtracting the sum from 5, so Pulsifer wants a court first

to combine A, B, and C and then to determine whether the defendant has the total.  By contrast, the Government reads the statute without parentheses, and so arrives at a different conclusion.  On its view, the "does not have" language operates on A, and on B, and on C consecutively, rather than on the three combined.  So the "and" connects three criminal-history conditions, all of which must be satisfied to gain safety-valve relief.  Or said another way, Paragraph (f)(1) requires that the defendant does not have A, and also does not have B, and finally does not have C.  If he has even one, he cannot complete the requisite checklist and so cannot gain the safety valve's benefits.

The Government's view rests on a routine aspect of expression—that an introductory phrase (here, "does not have") may apply to, or modify, several terms coming after it, one by one by one.  Suppose a person says after visiting a bookstore, "I bought a novel, a memoir, and a travel guide."  That is just a more efficient way of saying "I bought a novel, bought a memoir, and bought a travel guide."  The verb in the sentence carries over—some grammarians use the term "distribut[es]"—to every item on the ensuing list. B. Garner, Dictionary of Legal Usage 639 (3d ed. 2011). That practice is pervasive, indeed inescapable, in every kind of speech and writing.  Consider this, perhaps half-remembered line from childhood: "On Saturday he ate through one piece of chocolate cake, one ice-cream cone, one pickle, one slice of Swiss cheese, one slice of salami, one lollipop, one piece of cherry pie, one sausage, one cupcake, and one slice of watermelon."  E. Carle, The Very Hungry Caterpillar 15–16 (2018).  The introductory words "ate through" apply independently and equivalently to each of the ten foodstuffs that follow.  Or if that example seems too trifling, take a couple from the Constitution.  Article III provides that "[t]he judicial Power shall extend to all Cases . . . arising under this Constitution, the Laws of the United States, and Treaties." §2.  That statement means—but says

more concisely—that the judicial power extends to cases arising under the Constitution; extends to cases arising under federal law; and extends to cases arising under treaties. The provision does not (as Pulsifer's view might suggest) limit judges to hearing the few cases arising simultaneously under all three kinds of law. Similarly, Article I of the Constitution enables Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." §8, cl. 3. That authorization goes to commerce involving each kind of entity, not just to commerce involving the three at once. So again, the verb phrase operates on each term *seriatim*, not on the combination of the three.[3]

Pulsifer claims that verb phrases do not work the same way when "framed in the negative." Reply Brief 2. One of his favorite examples is "don't drink and drive." Brief for Pulsifer 16. That "doesn't mean," he observes, "that you shouldn't drink and that you shouldn't drive, but only [means] that you shouldn't do both at the same time." *Id.*, at 18 (emphasis deleted). So too, he says, for "don't clean

_____

[3] The dissent wrongly views this ordinary feature of language as a kind of uncanny trick. To understand a verb as applying to each of several ensuing terms (the dissent says) is to choose verbal "gymnastics" over "natural" meaning. *Post*, at 10. The dissent's primary proof is that such phrases can be rendered "with deleted words stricken and new ones added in bold." *Ibid.* Well, yes, but so what? It is true, as the dissent might say, that "I bought (1) a novel, (2) a memoir, and (3) a travel guide" is equivalent in meaning to "I ~~bought~~ (1) **bought** a novel, (2) **bought** a memoir, and (3) **bought** a travel guide." Cf. *ibid.* (similarly representing Paragraph (f)(1)). But ordinary people still understand the verb to carry over to all the books in the sentence. The strikeouts and boldface, far from evidencing manipulation of meaning, just illustrate how expression can naturally work. And that is so, contra the dissent (*post*, at 13–14), when a sentence's subject is singular (rather than plural)—as shown by most of the sentences in the paragraph above, many similar ones to come, see *infra*, at 10–11, and the vast number a reader can make up on her own.

the bathroom with bleach and ammonia." *Id.*, at 12 (emphasis deleted). The prohibition does not go to bleach alone and to ammonia alone; instead, it goes only to the two in conjunction. To return to math notation, the statement is best understood as "don't clean with (bleach and ammonia)," rather than "don't clean with bleach and don't clean with ammonia." See *supra*, at 7–8. And so too, he says, here: Paragraph (f)(1) conditions relief on a court's finding that a defendant "does not have (A, B, and C)," rather than that he "does not have A, does not have B, and does not have C."

But for every negative statement Pulsifer offers up, another cuts the opposite way (suggesting, as we later discuss, that here grammar is not the primary determinant of meaning). Consider two sentences discussed in The Cambridge Grammar of the English Language. If someone says "I'm not free on Saturday and Sunday," the Grammar notes, he most likely means "I'm not free on Saturday and I'm not free on Sunday"; he is not saying that although he cannot go away for a full weekend, he can make plans on one of those days. See R. Huddleston & G. Pullum 1298–1299 (2002) (emphasis deleted). Similarly, if a person says, "I didn't like his mother and father," he probably means "I didn't like his mother and I didn't like his father"—not that he didn't like the two in combination, but thought that either alone was fine. *Ibid.* (emphasis deleted).[4] Or take an example raised in oral argument pertaining, like Paragraph (f)(1), to an eligibility requirement: A hospital tells you that it can perform a medical procedure only if you "don't eat, drink, and smoke for the preceding 12 hours." See Tr. of Oral Arg. 6–8. Even Pulsifer's counsel agreed

———————————

[4] So too, a manual of contract drafting observes that "[t]he more natural meaning" of "Acme shall not notify Able and Baker" is "Acme shall not notify Able and shall not notify Baker," not that he shall not notify the two together, but may notify either one. K. Adams, A Manual of Style for Contract Drafting §11.16, p. 212 (3d ed. 2013) (emphasis deleted).

that he would not feel free to have a steak and martini so long as he abstained from tobacco. See *ibid*. The "don't" here, unlike in Pulsifer's examples, carries over to each action on the list (eating, drinking, and smoking alike)—not just to the three in tandem.

And if those examples of negatively framed statements, both Pulsifer's and ours, seem a tad conversational, consider a statute strikingly similar in form to Paragraph (f)(1). First return to that paragraph to remind yourself of how it looks and reads. See *supra*, at 3. Now check out 34 U. S. C. §20101(f):

> As used in this section, the term "offenses against the United States" does not include—
>
> (1) a criminal violation of the Uniform Code of Military Justice (10 U. S. C. 801 et seq.);
>
> (2) an offense against the laws of the District of Columbia; and
>
> (3) an offense triable by an Indian tribal court or Court of Indian Offenses.

The "does not include" language at the top of course refers independently to crimes satisfying (1), crimes satisfying (2), and crimes satisfying (3)—not to whatever crimes manage to satisfy (1), (2), and (3) all at once. Or said otherwise, the statute means exactly what it would mean if Congress had stripped the phrase "does not include" from the prefatory line and repeated it three times in the subsequent list. Congress, we recognize, just opted to draft more concisely. And so too it could have made that choice in drafting Paragraph (f)(1)—with the "does not have" phrase referring to every item that follows. No grammatical principle precludes that understanding of what Congress wrote.

Pulsifer protests that using the word "or" (instead of "and") would have better conveyed the Government's reading, but that claim also fails. His basic objection (echoed in the dissent, see *post*, at 16–17) is that Congress could have

expressed its intent more clearly. "If the government is right" about Paragraph (f)(1)'s meaning, Pulsifer asks, "why didn't Congress just use 'or'?"; doing so would have shown "unequivocally" that a defendant must meet all three of the specified conditions. Reply Brief 16; Tr. of Oral Arg. 10. But to begin with, we do not demand (or in truth expect) that Congress draft in the most translucent way possible. We have "routinely construed statutes to have a particular meaning even as we acknowledged that Congress could have expressed itself more clearly." *Luna Torres* v. *Lynch*, 578 U. S. 452, 472 (2016) (citing cases). And anyway, we doubt that substituting "or" for "and" would have delivered us from interpretive controversy. Instead, we would likely have confronted the mirror image of the dispute before us. The Government would have read the requirement that a defendant "does not have A, B, or C" to mean that he "does not have (A, B, or C)." So a defendant would get safety-valve relief only if he doesn't have any of the three listed criminal-history features. But Pulsifer, we suspect, would have read the same requirement to mean that a defendant "does not have A, does not have B, or does not have C." So he would get safety-valve relief as long as he doesn't have a single one of the listed features. That reading too is possible when viewed only as a matter of abstract grammar, divorced from any analysis of A, B, and C's content. Even with Pulsifer's proposed redrafting, then, the grammatical back-and-forth would continue.[5]

_____

[5] That is not to say, of course, that any negative statement involving the word "or" is realistically capable of two meanings; the point is only that context may drive such a statement in either direction. Consider two examples. First, suppose a restaurant chef decides to buy broccoli if his supplier "does not have spinach, eggplant, or cauliflower." That most likely means the chef will buy broccoli only when the supplier is out of all three other vegetables, not when he is out of just one. But second, suppose the same chef typically places a food order if the restaurant "does not have meat, produce, or bread." That most likely means he'll place an order when the restaurant runs out of one of those foodstuffs,

In fact, we can see why a Congress wishing to express the Government's view might have chosen to use "and." Suppose that before putting words to the page, Congress had decided (as the Government says) to create an eligibility checklist, requiring a defendant to meet three distinct conditions before getting safety-valve relief. In the subsequent drafting process, an "and" could well have seemed intuitive. After all, on the Government's "checklist" view, a defendant must meet every one of three conditions—this one *and* this one *and* this one. Or said more concretely, the defendant must not have "more than 4 criminal history points" *and* must not have a "3-point offense" *and* must not have a "2-point violent offense." So why not use an . . . "and"? It serves to connect the three necessary conditions coming off the (efficient) prefatory language. In other words, Congress might have thought that use of the conjunctive word "and" would reflect the needed conjunction of three requirements.

Consider, as a summary of all these points, Pulsifer's own main example, because it shows why Paragraph (f)(1)'s grammatical structure cannot decide this case—and points to the kind of analysis needed instead. Pulsifer offers a college policy, with an "and" connecting three provisions:

> All student-athletes are eligible for an academic scholarship, provided that the student during the previous semester did not—
> (A) miss more than five classes;
> (B) fail to submit a paper in the semesterly, campus-wide writing competition; and
> (C) earn less than a 3.0 GPA.

Brief for Pulsifer 19 (emphasis deleted). In Pulsifer's view,

---

not wait until it is lacking all three. The grammar in the two statements is identical, but their most natural understanding is not. Here, content drives meaning, so that in the one sentence, the absence of three items— and in the other sentence, the absence of one item—triggers the relevant purchase.

the policy is clear: A student may retain his scholarship un-
less he flunks "all three" of the conditions. *Ibid.* So a stu-
dent, Pulsifer contends, is in the clear if he "submitted a
paper in the writing competition and earned a 3.4 GPA . . .
even though he missed seven classes." *Ibid.* Which sounds
reasonable enough. But how about this one: A student who
misses only four classes, but fails to submit a competition
paper and "earns" a 1.0 GPA. Or similarly, a student who
submits a (terrible) paper, while missing all his classes and
obtaining the same "D" average. Is it now so clear that the
policy allows a student to flunk two of the conditions, rather
than requiring him to satisfy all three? Or is it, at the least,
uncertain? And even supposing not, consider a variation:

> All student-athletes are eligible for an academic schol-
> arship, provided that the student during the previous
> semester did not—
>     (A) fail a course;
>     (B) commit plagiarism; and
>     (C) get arrested.

A student would need a lot of confidence to argue that he
remains scholarship-eligible when he (A) failed a course,
and (B) committed plagiarism, but (C) managed to evade
arrest. That reading—Pulsifer's reading—is grammati-
cally possible. But so too is the opposite—that a student
must meet all three conditions. And when we think about
the content of the policy—what (A), (B), and (C) actually
say—against the backdrop of all we know (or perchance all
the college handbook tells us) about academic scholarships,
we cannot read the revised hypothetical in Pulsifer's way.

The takeaway is this: Paragraph (f)(1) cannot be con-
strued in the abstract, as if all a reader has to go on is the
stripped-down phrase "the defendant does not have A, B,
and C." That might require the defendant not to have (A,
B, and C)—*i.e.*, the combination of the three. Or it might
require the defendant not to have A, and not to have B, and

not to have C—*i.e.*, each of the three. Really, it all depends. (It is notable that even the dissent must in the end concede the point, noting that whether a speaker "intend[s] for a listener to distribute words implicitly" depends on the context. See *post*, at 15–16; *supra*, at 6, and n. 2). The way a reader assigns meaning to the phrase is to look at the substance of A, B, and C—the items on the list and the way they interact, as against relevant background understandings. Recall a couple of examples. See *supra*, at 9–11. We interpret the injunction against drinking and driving in Pulsifer's way— "do not (A and B)"—because the two activities are usually perilous only in combination. We interpret the injunction against eating and drinking before surgery in the Government's way—"do not A and do not B"—because each activity alone is likely to have adverse consequence. Similarly here, the meaning of Paragraph (f)(1) may become clear if we examine the content of its three subparagraphs—what they say and how they relate to each other—as well as how they fit with other pertinent law. Or stated in the usual language of statutory construction, the answer may lie in considering the paragraph's text in its legal context.

### III
### A

And indeed, that inquiry into text and context makes Paragraph (f)(1)'s meaning clear. The paragraph creates an eligibility checklist. It specifies three necessary conditions for safety-valve relief—that the defendant not have more than four criminal-history points, not have a prior three-point offense, and not have a prior two-point violent offense. Reading the paragraph instead to set out a single condition—that the defendant not have the *combination* of the listed characteristics—would create two statutory difficulties. First, Subparagraph A would become superfluous— without any operative significance. That is because if a defendant has a three-point offense under Subparagraph B

and a two-point offense under Subparagraph C, he will al-
ways have more than four criminal-history points under
Subparagraph A. Second, defendants' eligibility for relief
would not correspond to the seriousness of their criminal
records. Instead, a defendant with numerous violent three-
point offenses could get relief because he happens not to
have a two-point offense. The content of Subparagraphs A,
B, and C, especially as read against the Guidelines, thus
answers the statutory puzzle here—reducing two grammat-
ical possibilities to just one plausible construction.

Begin with superfluity. Or actually with its absence—
because there is none under the Government's reading.
Each subparagraph does independent work, disqualifying
defendants from relief even when the others would not.
Subparagraph A disqualifies defendants who have more
than four criminal-history points (excluding those from a
one-point offense), even if they do not have a prior three-
point offense or a prior two-point violent offense. So, for
example, a defendant with three non-violent two-point of-
fenses will be barred. Subparagraph B, in turn, disqualifies
defendants who have any prior three-point offense, even if
they do not have a two-point violent offense or more than
four total points. And finally, Subparagraph C disqualifies
defendants who have a prior two-point violent offense, even
if they do not have a three-point offense or more than four
points. The paragraph thus excludes (A) various repeat of-
fenders, along with anyone having even a single conviction
that (B) resulted in a sufficiently long prison sentence or (C)
resulted in a shorter sentence but involved violence. Every
part of the paragraph has a function.

But that is not so under Pulsifer's reading, as a bit of
arithmetic reveals. Pulsifer's view, once again, is that Par-
agraph (f)(1) disqualifies only defendants with the combi-
nation of the characteristics in Subparagraphs A, B, and
C—so more than four criminal-history points, a prior three-

point offense, and a prior two-point violent one. But because $3 + 2 = 5$, and because 5 is more than 4, a defendant with a three-point offense (Subparagraph B) and a two-point violent offense (Subparagraph C) will necessarily have more than four history points (Subparagraph A). So Subparagraph A becomes meaningless: It does no independent work. Remove it from the statute, and what is left will make the exact same people eligible (and ineligible) for relief.

And that kind of superfluity, in and of itself, refutes Pulsifer's reading. The problem here is no odd word or stray phrase, which might have escaped Congress's notice. Pulsifer's reading would negate one of three—indeed, the first of three—provisions in the very paragraph he is trying to interpret. When a statutory construction thus "render[s] an entire subparagraph meaningless," this Court has noted, the canon against surplusage applies with special force. *National Assn. of Mfrs.* v. *Department of Defense*, 583 U. S. 109, 128 (2018); see *Chicago* v. *Fulton*, 592 U. S. 154, 159 (2021). And still more when the subparagraph is so evidently designed to serve a concrete function. In addressing eligibility for sentencing relief, Congress specified three particular features of a defendant's criminal history—A, B, and C. It would not have done so if A had no possible effect. It would then have enacted: B and C. But while that is the paragraph Pulsifer's reading produces, it is not the paragraph Congress wrote.

To escape that quandary, Pulsifer contends that under the Guidelines a three-point offense and a two-point offense do not always total five criminal-history points. (The dissent reiterates Pulsifer's assertion. See *post*, at 21–24.) The argument begins with a point not in dispute: Some prior convictions, as noted earlier, add zero points to a defendant's criminal-history score. See *supra*, at 3. That is true if the conviction is quite old; if it was rendered in a military, tribal or foreign court; or if it merged into another

conviction because, for example, the two arose from "the same charging instrument." §4A1.2(a)(2); see §4A1.2(e), (g)–(i). The key move in Pulsifer's argument is the next one: He claims that a prior offense adding zero points to a history score can still be a three-point or two-point offense under Paragraph (f)(1). That happens, he says, when the sentence given for the offense was long enough to *otherwise* add those points—meaning, in the absence of the trait that reduced points to zero. See Brief for Pulsifer 36–41. Take an example: A very old conviction contributes zero points to a defendant's history score, no matter how long the sentence. Still, Pulsifer contends, it is a three-point offense when the sentence given was sufficiently long (over 13 months) to add three points in a case *not* very old. And once that proposition is accepted, Pulsifer says, superfluity disappears. Suppose a defendant has, along with the old conviction just described, a newer two-point violent offense. The old conviction, Pulsifer maintains, is a three-point offense satisfying Subparagraph B. And the new conviction satisfies Subparagraph C. But the defendant has only two criminal-history points—zero from the old offense and two from the new—which is not enough to satisfy Subparagraph A. So that subparagraph, Pulsifer concludes, has an effect: It keeps such a defendant eligible for safety-valve relief.

But Pulsifer's argument craters because its key move is wrong: Contrary to his view, there is no such thing under the Guidelines as a three-point or two-point offense adding zero points. Under Subparagraphs B and C, the terms "3-point offense" and "2-point violent offense" are "as determined under the sentencing guidelines." §3553(f)(1)(B)–(C). And the Guidelines assign points to an offense only in the context, and for the purpose, of "[a]dd[ing]" them to a defendant's "criminal history" "total." §4A1.1. So a conviction becomes a three- or two-point offense only when—only *because*—it adds three or two points to a total history score. Or said the other way round, only the addition of three or

two points to that score makes the offense a three- or two-point offense. The corollary is that a conviction adding zero points—because, say, it is very old—cannot be a three- or two-point offense. It is (unsurprisingly) a zero-point of-fense—whatever would be the case if the conviction were newer. For that reason, such a conviction cannot aid Pul-sifer's effort to find a function for Subparagraph A. Because only the addition of three or two points can make an offense a three- or two-point offense, a defendant who has a prior three-point offense and a prior two-point violent offense will always have (arithmetic again) more than four points total. The Guidelines' mechanics thus foreclose Pulsifer's effort to erase the superfluity his reading creates.[6]

Yet more, Pulsifer's effort founders on the Guidelines' judgments, reflected in Paragraph (f)(1), about which prior offenses warrant enhanced punishment. Consider what Pulsifer's zero-to-three claim entails. Because an offense adding zero points can on his account satisfy Subparagraph

————————

[6] The dissent tries to save Pulsifer's effort by offering an account of the Guidelines' mechanics different from that given in the Guidelines them-selves. According to the dissent, the Guidelines "set forth a two-step pro-cess" in which a judge first "assigns points to the defendant's prior of-fenses" under §4A1.1 and only then "computes the defendant's criminal history" score under §4A1.2. *Post*, at 22. So, the dissent claims, a court may first count two or three points for an old conviction (under §4A1.1) and then exclude those points from the computation of a history score (under §4A1.2). See *ibid.* But in fact there are no "two steps" under the Guidelines. As even the dissent concedes in one self-contradictory mo-ment, see *ibid.*, there is only a single calculation, with §4A1.2 providing the "[d]efinitions and [i]nstructions" for §4A1.1's "add[ing]" and "to-tal[ing]." (Given that relationship, the commentary explains, the two provisions "must be read together." USSG ch. 4, pt. A, intro.). And among §4A1.2's "[i]nstructions" is that old convictions simply "not [be] counted"—rather than, as the dissent would have it, that they be first counted and then uncounted. In other words, as §4A1.2's commentary states, an old conviction should "receive[] no criminal history points" in the §4A1.1 calculation. USSG §4A1.2 comment., n. 3. So again: Neither Pulsifer nor the dissent can transform an old conviction into a two- or three-point offense.

B or C, it can help prevent a defendant from gaining safety-valve relief. But that result ill comports with the Guidelines. There are, after all, reasons why the Guidelines decline to assign points to certain offenses. The specifics vary, but each embodies a judgment that some types of prior convictions should not have the usual weight in determining a current sentence. Maybe the prior conviction is not as reliable as most. Or maybe it is not so good a measure of the defendant's future dangerousness. Whatever the precise explanation, the Guidelines give zero points to an offense in order to ensure that it not increase a later punishment. Except that under Pulsifer's view it could do just that: Offenses that the Guidelines deem irrelevant to future sentencing might end up triggering a mandatory minimum. And likewise, Pulsifer's view conflicts with a discrete feature of Paragraph (f)(1). Recall that under that paragraph, an offense earning *one* point cannot affect eligibility for relief, either alone or in combination with any other offense—presumably because a one-point offense is just too minor. See §3553(f)(1); *supra*, at 4. Yet Pulsifer's theory would allow an offense adding *zero* points to contribute to a finding that relief is barred. That claim is, again, too out-of-sync with the statutory framework to offer an escape from his "3 + 2 = 5" superfluity problem.

And beyond that problem lies a second, this one relating to the way Paragraph (f)(1) precludes safety-valve relief for defendants with serious criminal histories. The paragraph operates as a gatekeeper: It helps get some defendants into, and keeps other defendants out of, a world free of mandatory minimums. And the criteria for selection, evident on the paragraph's face, relate to just how bad a defendant's criminal record is. Pulsifer himself recognizes that fact: In describing Paragraph (f)(1), he notes that "subparagraph (A) targets recidivism"; that "subparagraph (B) targets serious offenses" leading to lengthy prison terms; and that

"subparagraph (C) targets violent offenses" even though re-
sulting in lesser sentences. Brief for Pulsifer 25; see *id.*, at
44 (noting that each subparagraph addresses a "type[] of
behavior suggestive of future dangerousness"). The para-
graph thus focuses on the kinds of past criminal behavior
that under the Guidelines trigger enhanced penalties. Over
and over, the Guidelines presume that defendants with
worse criminal records—exhibiting recidivism, lengthy sen-
tences, and violence—are "deserving of greater punish-
ment." USSG ch. 4, pt. A, intro. comment.; see §4A1.1;
USSG ch. 5, pt. A. Paragraph (f)(1), in line with its re-
peated invocation of the Guidelines, expresses the same un-
derstanding. Put simply, the paragraph sorts defendants
for relief (or not) based on the seriousness of their criminal
history.

Under the Government's reading, Paragraph (f)(1) per-
forms that function without a hitch. When the defendant
has committed multiple non-minor offenses, he cannot get
relief (Subparagraph A). And so too when he has committed
even a single offense punished with a lengthy prison sen-
tence (Subparagraph B) or involving violence (Subpara-
graph C). Only a defendant with none of those markers—a
defendant who can check off every one of the three "does not
have" requirements—is eligible for relief. So the paragraph
unerringly separates more serious prior offenders from less
serious ones, allowing only the latter through the gate.

That does not happen under Pulsifer's construction. To
the contrary, his reading would allow relief to defendants
with more serious records while barring relief to defendants
with less serious ones. Or said otherwise, the sorting ac-
complished by Pulsifer's reading does not match what Par-
agraph (f)(1) and the Guidelines call for. Consider two hy-
pothetical defendants. One has five criminal-history points
from a prior three-point offense and a prior two-point vio-
lent offense. The other has 15 criminal-history points from
five prior three-point offenses, every last one of a violent

nature, but . . . has no two-point violent offense. (All his crimes were too serious to wind up in the two-point category.) Which of the two defendants is the more serious prior offender? The latter of course: His record exhibits greater recidivism, lengthier sentences, and more violence. But under Pulsifer's view of Paragraph (f)(1), which of the two defendants is excluded from relief? The former alone. For want of a two-point offense, the latter remains eligible to avoid a mandatory minimum. The paragraph thus fails to divide, at the gate for safety-valve relief, more from less serious prior offenders.[7]

And contrary to Pulsifer's view, that problem cannot be solved by resort to a sentencing judge's discretion. Notably, Pulsifer does not argue that there is any rhyme or reason to making our serial three-point violent offender eligible for safety-valve relief. He says only that Congress "had no reason to be concerned" about that outcome because it knew "that a sentencing court would still have discretion to impose a proportionate sentence." Brief for Pulsifer 25; see *id.*, at 45; see also *post*, at 28–29 (GORSUCH, J., dissenting) (similarly relying on judges' ability, even without mandatory minimums, to impose lengthy sentences). But that "trust in discretion" claim cannot here work. If Congress thought it could always rely on sentencing discretion, it

———————

[7] The dissent labors unsuccessfully to find an explanation for this state of affairs. Here is what it comes up with: Sometimes Congress opts for "standardized formulas" or bright-line tests even though their "over- and under-inclusi[on]" will produce statutory "anomalies." *Post*, at 27–28 (citing *Ransom* v. *FIA Card Services, N. A.*, 562 U. S. 61, 78 (2011)); see *post*, at 29. That is true enough, but has no application here. Pulsifer's view of the statute is no more "standardized" than the Government's— and so no more predictable or administrable. The dissent thus remains without a plausible, or even cogent, explanation for the failure of its interpretation (and its interpretation alone) to perform the statute's gatekeeping role—in Pulsifer's own words, to separate defendants whose criminal history is more "suggestive of future dangerousness" from defendants whose criminal history is less so. Brief for Pulsifer 44.

would not have created a criminal-history requirement in the first instance. That requirement, by its terms, confines such discretion. More specifically, it allows discretion to operate only when a defendant's record does not reach a certain level of seriousness. On the Government's reading, the paragraph well performs that gatekeeping function, separating more serious from less serious criminal histories. On Pulsifer's reading, the paragraph does not: As just shown, it allows and denies relief in ways that do not correspond to the gravity of what a defendant has previously done. The need for a judge to correct those results—which Pulsifer admits—shows that his reading is wrong. Once again, his construction of Paragraph (f)(1)—however grammatical— makes a hash of the scheme Congress devised.

B

Pulsifer tries to tell a competing story (which the dissent mostly adopts, see *post*, at 8–9, 18–19). Even supposing the grammar of Paragraph (f)(1) is a wash, Pulsifer contends that statutory context supports his view of what that provision means by "and." His argument invokes the "presumption of consistent usage and the meaningful-variation canon." Brief for Pulsifer 22. Those are the terms often given to a generally useful—but still "defeasible"—interpretive principle: In a given statute, the same term usually has the same meaning and different terms usually have different meanings. A. Scalia & B. Garner, Reading Law 170– 171 (2012). The principle is mostly applied to terms with some heft and distinctiveness, whose use drafters are likely to keep track of and standardize. See, *e.g.*, *IBP, Inc.* v. *Alvarez*, 546 U. S. 21, 33–34 (2005) (construing the term "principal activity" in the same way when used in neighboring provisions); *Wisconsin Central Ltd.* v. *United States*, 585 U. S. 274, 279 (2018) (holding that "money remuneration" must mean something different from "all remunera-

tion" when used in "companion" statutes (emphasis deleted)). Pulsifer breaks new ground in applying the principle to words as ubiquitous and (as shown above) sometimes context-dependent as "and" and "or." See *supra*, at 6–23. He argues, more specifically, that another "and" plus an "or" in Section 3553(f) show that the "and" in Paragraph (f)(1) must be read his way. But even accepting that a court can sometimes demand harmonization of "and"s and "or"s, Pulsifer's argument fails.

Take the other "and" first. As noted earlier, the criminal-history requirement is only one of five conditions for safety-valve relief set out in Section 3553(f). See *supra*, at 2–3. Those conditions appear in a list—Paragraphs (f)(1) through (f)(5)—with an "and" linking them, just as an "and" links Paragraph (f)(1)'s three subparagraphs. A look at the appendix may be helpful here. See *infra*, at 29. The stylized version of the list in Section 3553(f) (with content removed) goes as follows: The safety valve operates "if the court finds" 1, 2, 3, 4, "and" 5.

The problem for Pulsifer is that the meaning of the "and" in Section 3553(f) does not advance his reading of Paragraph (f)(1). Everyone, including Pulsifer, agrees that the "and" in Section 3553(f) connects five requirements for safety-valve relief, all of which a defendant must meet. In Pulsifer's view, the Government has to read Paragraph (f)(1)'s "and" differently to make each one of its subparagraphs disqualifying. See Brief for Pulsifer 21; Reply Brief 14–15. But that is just wrong. The "and" in Section 3553(f) works identically to the "and" in the Government's reading of Paragraph (f)(1). Section 3553(f)'s "and" creates an eligibility checklist. A defendant fulfills that provision's requirements if the court finds 1, finds 2, finds 3, finds 4, and (finally) finds 5. So the "and" joins five individually necessary conditions for relief. Likewise, the "and" in the Government's construction of Paragraph (f)(1) creates an eligibility checklist. A defendant satisfies that paragraph's

requirements if he does not have A, does not have B, and (finally) does not have C. So again, the "and" joins several individually necessary conditions for safety-valve relief. Everything is consistent, in meaning and operation alike. It is actually Pulsifer who introduces dissonance into the provision. As to the larger list, he acknowledges that a defendant cannot get relief without checking off 1, 2, 3, 4, and 5 individually. But as to the smaller list, Pulsifer changes the rule. Now a defendant need not satisfy A, B, and C individually. Instead, he can get relief so long as he does not have A, B, and C combined. In other words, in Pulsifer's world, Section 3553(f) is an eligibility checklist, but Paragraph (f)(1) is not.

Pulsifer's deployment of another paragraph's "or" fares no better. Section 3553(f)(4) conditions safety-valve relief on a finding that the "defendant was not an organizer, leader, manager, or supervisor of others in the offense." See *supra*, at 2. Congress thus used an "or" to signify that being any one of those things is disqualifying. Invoking the meaningful-variation canon, Pulsifer argues that the different term "and" in Paragraph (f)(1) must mean the opposite: that only the combination of the listed things disqualifies a defendant. See Brief for Pulsifer 21–22. Recall that we have already rejected Pulsifer's unadorned view that the word "or" is needed to convey the Government's reading of Paragraph (f)(1). See *supra*, at 11–13. Pulsifer's additional reference to Paragraph (f)(4)'s "or" does not strengthen his case. As we have shown throughout this opinion, conjunctions are versatile words, which can work differently depending on context. Here is yet another example. As another glance at the appendix will confirm, the relevant clause in Paragraph (f)(4) is markedly different in length and formatting from the material in Paragraph (f)(1), naturally leading to different choices respecting the use of conjunctions. And anyway, Congress drafted the current versions of the paragraphs at different times—Paragraph

(f)(4) in 1994, Paragraph (f)(1) in 2018. See Violent Crime Control and Law Enforcement Act of 1994, 108 Stat. 1985; First Step Act of 2018, Pub. L. 115–391, 132 Stat. 5221. It would hardly be surprising if 24 years later, Paragraph (f)(1)'s drafters did not perfectly harmonize their conjunction usage with a dissimilar-looking nearby paragraph. There can be few better illustrations of the "defeasib[ility]" of the meaningful-variation canon. Scalia, Reading Law, at 171.

Finally, Pulsifer and the dissent make a misguided argument about legislative purpose. As noted earlier, Congress enacted the revised version of Paragraph (f)(1) as part of the First Step Act, a significant sentencing reform law. See *supra*, at 2–3. Pulsifer explains that the new provision was meant "to make safety-valve relief more widely available." Brief for Pulsifer 22. And the dissent highlights how many more defendants would get safety-valve relief under Pulsifer's reading than under the Government's. See *post*, at 7; see also *post*, at 1–7, 19. We do not doubt the points. But they do not assist in interpreting the statutory text before us. Both views of the paragraph—Pulsifer's and the Government's—significantly widen the opportunity for safety-valve relief; recall that under the prior provision, anything more than a single criminal-history point precluded deviation from a mandatory minimum. See *supra*, at 2–3. And Pulsifer's interpretation is not better just because it would go further than the Government's. "[N]o law pursues its . . . purpose[s] at all costs." *Luna Perez* v. *Sturgis Public Schools*, 598 U. S. 142, 150 (2023). So here, Congress did not eliminate but only curtailed mandatory minimums— did not extend safety-valve relief to all defendants, but only to some. And to determine the exact contours of that class, we can do no better than examine Paragraph (f)(1)'s text in context. For all the reasons given, that scrutiny reveals that Pulsifer's view goes too far.

IV

Yet Pulsifer (joined again by the dissent, see *post*, at 31–32) asserts we are not done. At the least, he claims, the meaning of the criminal-history requirement is uncertain. And because it is uncertain, he must win. The rule of lenity, he says, requires courts to read "ambiguous criminal statutes in favor of liberty." Brief for Pulsifer 47.

The problem is that we do not view Paragraph (f )(1) as genuinely ambiguous.[8] There are, to be sure, two grammatically permissible readings of the statute when viewed in the abstract. It may be read Pulsifer's way—as stating that a defendant can get safety-valve relief so long as he does not have the combination (A, B, and C). Or it may be read the Government's way—as stating that a defendant can get safety-valve relief only if he does not have A, does not have B, and does not have C. But the difficulty in choosing between those two constructions falls away once we consider the content of Subparagraphs A, B, and C: more than four criminal-history points (excluding points from a one-point offense), a prior three-point offense, and a prior two-point violent offense, all as determined under the Sentencing Guidelines. Then we discover that Pulsifer's view creates glaring superfluity, whereas the Government's view does not. And we discover that only the Government's view renders the provision capable of sorting more serious from less serious criminal records, consistent with both the statute's and the Guidelines' designs. The two possible readings thus reduce to one—leaving no role for lenity to play.

In sum, Paragraph (f )(1)'s criminal-history requirement sets out an eligibility checklist. A defendant is eligible for safety-valve relief only if he satisfies each of the paragraph's three conditions. He cannot have more than four criminal-

_____

[8] For that reason, we have no need to address the Government's argument that the rule of lenity does not apply to Paragraph (f )(1) because it is not properly considered a "penal law." Brief for United States 46–47.

history points.  He cannot have a prior three-point offense. And he cannot have a prior two-point violent offense.  Because Pulsifer has two prior three-point offenses totaling six points, he is not eligible.  It makes no difference that he does not also have a prior two-point violent offense.  Accordingly, we affirm the judgment of the Court of Appeals for the Eighth Circuit.

*It is so ordered.*

APPENDIX

**§3553. Imposition of a sentence**

.        .        .        .        .

(f) LIMITATION ON APPLICABILITY OF STATUTORY MINIMUMS IN CERTAIN CASES.—Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U. S. C. 841, 844, 846), section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U. S. C. 960, 963), or section 70503 or 70506 of title 46, the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—

(1) the defendant does not have—

(A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;

(B) a prior 3-point offense, as determined under the sentencing guidelines; and

(C) a prior 2-point violent offense, as determined under the sentencing guidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

Information disclosed by a defendant under this subsection may not be used to enhance the sentence of the defendant unless the information relates to a violent offense.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–340

_____

## MARK E. PULSIFER, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[March 15, 2024]

JUSTICE GORSUCH, with whom JUSTICE SOTOMAYOR and JUSTICE JACKSON join, dissenting.

The First Step Act of 2018 may be "'the most significant criminal justice reform bill in a generation.'" Brief for Sen. Richard J. Durbin et al. as *Amici Curiae* in *Terry* v. *United States*, O. T. 2020, No. 20–5904, p. 9. Through the 1980s and 1990s, Congress adopted an ever-increasing number of ever-longer mandatory minimum prison sentences. In part due to these policies, the federal prison population grew by more than 100% in less than a decade. In the First Step Act, Congress sought to recalibrate its approach. It did so by promising more individuals the chance to avoid one-size-fits-all mandatory minimums and receive instead sentences that account for their particular circumstances and crimes.

This dispute concerns who is eligible for individualized sentencing and who remains subject to mandatory minimums after the First Step Act. Before the Act, a defendant seeking to avoid a mandatory minimum had to satisfy five stringent statutory tests. After the Act, all those tests remain, only the first is now less demanding. As revised, it provides that a defendant may be eligible for individualized sentencing if he "does not have" three traits: (A) more than 4 criminal history points, (B) a 3-point offense, and (C) a 2-point violent offense. In lower court proceedings, the government admitted that this new test is "most natural[ly]" read to mean what it says: A defendant may be eligible for

individualized sentencing unless he possesses all three listed traits—A, B, *and* C. Brief for United States in No. 19–50305 (CA9), p. 7 (Government CA9 Brief); *id.*, at 10–11; accord, Brief for United States in No. 21–1609 (CA8), p. 11 (Government CA8 Brief). Despite its admission, however, the government urges us to adopt a different construction. It asks us to read the First Step Act as promising a defendant a chance at individualized sentencing only when he does not have any of the three listed traits—A, B, *or* C.

If this difference seems a small one, it is anything but. Adopting the government's preferred interpretation guarantees that thousands more people in the federal criminal justice system will be denied a chance—just a chance—at an individualized sentence. For them, the First Step Act offers no hope. Nor, it seems, is there any rule of statutory interpretation the government won't set aside to reach that result. Ordinary meaning is its first victim. Contextual clues follow. Our traditional practice of construing penal laws strictly falls by the wayside too. Replacing all that are policy concerns we have no business considering. Respectfully, I would not indulge any of these moves.

I

A

In approaching the dispute before us, some background helps. Before the 1980s, federal judges generally enjoyed broad discretion at sentencing. Often, they could impose punishments ranging from probation up to statutorily specified maximum prison terms. *Mistretta* v. *United States*, 488 U. S. 361, 363 (1989). In exercising that discretion, judges had to "consider every convicted person as an individual" and pick punishments that "fit the offender and not merely the crime." *Pepper* v. *United States*, 562 U. S. 476, 487–488 (2011).

Today, many defendants still receive individualized sentences. In the mine run of federal cases, a court will start with sentencing guidelines the United States Sentencing Commission has prepared at Congress's direction. The guidelines help a court identify a range of presumptively reasonable sentences tailored to the defendant and his crime. See *Rita* v. *United States*, 551 U. S. 338, 347 (2007). That range depends on an "offense level," a figure that takes into account the seriousness of the defendant's crime and his role in it, as well as the defendant's "criminal history" score, a tallying that accounts for his past misconduct. United States Sentencing Commission, Guidelines Manual §§1B1.1, 4A1.1–4A1.2, ch. 5, pt. A (Nov. 2023) (USSG); see *Rosales-Mireles* v. *United States*, 585 U. S. 129, 133–134 (2018). The guidelines, however, are just that. A sentencing judge may sometimes depart or vary from the guidelines' recommended range, picking a lower or higher sentence if it best fits the defendant and broader penological goals Congress has instructed courts to consider. See *Gall* v. *United States*, 552 U. S. 38, 46, 49–50 (2007); 18 U. S. C. §3553(a).

In the 1980s and 1990s, Congress pursued a different approach for certain drug offenses. See Anti-Drug Abuse Act of 1986, 100 Stat. 3207–2 to 3207–4; Anti-Drug Abuse Act of 1988, 102 Stat. 4370, 4377–4378. It required courts to impose mandatory minimum prison terms based only on the kind and quantity of the drugs involved in the defendant's crime. A court "was required to send the offender to prison" for a set period of years "no matter how minor the offender's participation in the offense may have been, and no matter what mitigating circumstances might have been present." J. Rakoff, Why the Innocent Plead Guilty and the Guilty Go Free 13 (2021). Under this regime, for example, a defendant distributing 5 grams of crack cocaine faced a 5-year mandatory prison term, and one with 50 grams faced a 10-year term. 100 Stat. 3207–2 to 3207–3. Meanwhile, a

defendant found with powder cocaine confronted those same prison terms only if he distributed 100 times those amounts. *Ibid.*

In short order, the federal prison population exploded. In 1986, federal prisoners numbered 30,104, approximately 37.7% of whom were serving time for drug offenses. Dept. of Justice, Sourcebook of Criminal Justice Statistics 519 (31st ed. 2003). By 1994, the federal prison population reached almost 74,000, with approximately 61.3% of in- mates serving time for a drug offense. *Ibid.*

Calls for reform came quickly and grew with time. See, *e.g.*, U. S. Sentencing Commission, Special Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System iii (1991); *id.*, App. G (collecting statements from the Judicial Conference and 12 circuits). Eventually, Congress responded to these calls in various ways. In one reform, for example, it prospectively reduced the crack-cocaine disparity from 100:1 to 18:1. See Fair Sentencing Act of 2010, 124 Stat. 2372. In another, it adopted §3553(f), a provision that came to be called the "safety valve" and that lies at the heart of today's case. See Violent Crime Control and Law Enforcement Act of 1994, 108 Stat. 1985–1986.

As originally enacted in 1994, the safety valve provided modest relief. It exempted defendants who could meet five statutory criteria from otherwise-applicable mandatory minimums, directing instead that they should receive indi- vidualized sentences. *Ibid.* (codified as amended at 18 U. S. C. §3553(f)). But the first of the safety valve's five criteria, codified in paragraph (f)(1), was especially de- manding. It precluded relief for any individual with "more than 1 criminal history point"—meaning that a defendant could find himself ineligible for individualized sentencing if his background included even a single 60-day prison term or two prior offenses involving no prison term at all. 108 Stat. 1985; see §3553(f)(1) (1994 ed.); USSG §§4A1.1(b)–(c),

4A1.2 (Nov. 1994).

## B

In the First Step Act of 2018, Congress adopted an array of further reforms. Pub. L. 115–391, 132 Stat. 5194. Passed with overwhelming majorities in both chambers of Congress and with presidential support, the Act reduced the length of some mandatory minimums by 25 percent. See §401, *id.*, at 5220–5221. It narrowed the circumstances under which a court could "stack" certain mandatory minimums on top of one another. See §403(a), *id.*, at 5221–5222; U. S. Sentencing Commission, The First Step Act of 2018: One Year of Implementation 5 (2020). And it made Congress's earlier amendment to the crack-cocaine disparity retroactive, allowing individuals sentenced before that amendment's adoption a chance at resentencing. See §404, 132 Stat. 5222.

The First Step Act also revised the safety valve's first provision. Where paragraph (f)(1) once barred a defendant with even a single criminal history point from receiving an individualized sentence, Congress now chose a different course. As amended, the full safety valve today instructs a court to afford an individualized sentence "if [it] finds at sentencing . . . that—"

> "(1) the defendant does not have—
>
> "(A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
>
> "(B) a prior 3-point offense, as determined under the sentencing guidelines; and
>
> "(C) a prior 2-point violent offense, as determined under the sentencing guidelines;
>
> "(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

"(3) the offense did not result in death or serious bodily injury to any person;

"(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in . . . the Controlled Substances Act; and

"(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same . . . common scheme or plan . . . ." 18 U. S. C. §3553(f).

## C

The question we face concerns how the amended safety valve works. Everyone agrees that a defendant must still clear five daunting statutory hurdles. But the parties disagree what the first entails after the First Step Act. Observing that the word "and" connects each of the subparagraphs (f)(1)(A), (B), and (C), Mark Pulsifer argues that the safety valve's first provision now operates to render ineligible one kind of defendant—a defendant who bears all three enumerated traits, A, B, *and* C. Because he does not have all three, Mr. Pulsifer submits, he is eligible for safety-valve relief as long as he can satisfy the law's four remaining provisions. Meanwhile, on the government's telling, paragraph (f)(1) renders three kinds of defendants ineligible for relief—any defendant who has trait A, B, *or* C. And because Mr. Pulsifer has at least one of those traits, the rest of the safety valve is irrelevant; paragraph (f)(1) alone renders him ineligible for relief.

Disputes about the amended safety valve's operation have simmered for years in the lower courts and yielded

conflicting results.[1] At least one thing, though, is clear: The dispute before us matters profoundly. According to a Sentencing Commission analysis based on 2021 data, about 33% of drug offenders were eligible for safety-valve relief under the law's old terms. See 88 Fed. Reg. 7186 (2023). Under Mr. Pulsifer's understanding of the First Step Act, about 66% would become eligible for individualized sentencing. See *ibid.* By contrast, under the government's reading of the Act, that number would shrink to around 44%. See *ibid.* Our decision today thus promises to affect the lives and liberty of thousands of individuals.

## II

Unless some feature of the law suggests that one or another of its terms bears a specialized meaning, our duty is to interpret Congress's work as an ordinary reader would. See *Niz-Chavez* v. *Garland*, 593 U. S. 155, 163 (2021). At the heart of today's dispute lies no specialized term but perhaps the most ordinary of words: Everything turns on what work the word "and" performs in paragraph (f)(1), where a sentencing court is tasked with determining whether "the defendant does not have" three traits—A, B, "and" C.

## A

In taking up the parties' dispute, start with a few simple and uncontested observations. First, as the Court agrees, "and" is "a conjunction—a word whose function is to connect specified items." *Ante,* at 7; see J. Opdycke, Harper's English Grammar 200 (rev. ed. 1966).

---

[1] The Fourth, Ninth, and Eleventh Circuits have taken Mr. Pulsifer's approach. See *United States* v. *Jones*, 60 F. 4th 230 (CA4 2023); *United States* v. *Lopez*, 998 F. 3d 431 (CA9 2021); *United States* v. *Garcon*, 54 F. 4th 1274 (CA11 2022) (en banc). The Fifth, Sixth, Seventh, and Eighth Circuits have taken the government's view. See *United States* v. *Palomares*, 52 F. 4th 640 (CA5 2022); *United States* v. *Haynes*, 55 F. 4th 1075 (CA6 2022); *United States* v. *Pace*, 48 F. 4th 741 (CA7 2022); 39 F. 4th 1018 (CA8 2022) (case below).

Second, and more specifically, "and" is an "additive" conjunction, one often indicating that the words it connects should be added together. *Id.*, at 200; The Chicago Manual of Style §5.183, p. 191 (15th ed. 2003). As the Court explains, when "and" performs that role, it means "[t]ogether with," "along with," "in addition to," or "as well as." American Heritage Dictionary 66 (5th ed. 2018); see *ante,* at 7.

Third, in paragraph (f)(1) "and" connects a list in a negative conditional statement ("if . . . the defendant does not have"). Negative conditional "if . . . not" statements often function like the word "unless." See R. Huddleston & G. Pullum, The Cambridge Grammar of the English Language §14.3, p. 755 (2002). Consider the mother who tells her child, "If you do not have any homework left, you can go play with your friends." The child would understand that he could play with his friends *unless* he had homework left to do.

Now apply those observations to paragraph (f)(1). Given the meaning of "and," an ordinary reader would naturally understand that a defendant is eligible for individualized sentencing if he "does not have" trait A, trait B, *together with* trait C. Add to the mix what we know about the interchangeability of "if . . . not" and "unless": A defendant may receive guidelines sentencing *unless* he has trait A, trait B, *together with* trait C. Put the points together, and the statute indicates that a court may issue an individualized sentence unless the defendant has all three traits listed in §3553(f)(1), just as Mr. Pulsifer contends.

## B

What the language of paragraph (f)(1) suggests, surrounding context confirms. When Congress uses different terms in a statute, we normally presume it does so to convey different meanings. *Southwest Airlines Co.* v. *Saxon*, 596 U. S. 450, 457–458 (2022). We sometimes call this presumption the "meaningful-variation canon." *Id.*, at 457.

Here, we see just such a meaningful variation. When Congress sought a single word to indicate that one trait among many is sufficient to disqualify an individual from safety-valve relief, it chose an obvious solution: not the conjunctive "and," but the disjunctive "or."

In fact, Congress used "or" this way no fewer than three times. Paragraph (f)(2) specifies that, for a defendant to be eligible for individualized sentencing, a court must find that "the defendant did not use violence *or* credible threats of violence *or* possess a firearm *or* other dangerous weapon (*or* induce another participant to do so) in connection with the offense." (Emphases added.) Paragraph (f)(3) premises eligibility on a finding that a defendant's "offense did not result in death *or* serious bodily injury to any person." (Emphasis added.) And paragraph (f)(4) provides that eligibility for relief turns on whether the defendant "was not an organizer, leader, manager, *or* supervisor of others in the offense." (Emphasis added.)

The fact that Congress repeatedly used "or" when it wanted relief to turn on a single trait among many suggests that the "and" in paragraph (f)(1) performs different work. Even the government once acknowledged as much, conceding below that the "and" in paragraph (f)(1) is "most natural[ly]" read as requiring a sentencing court to find that a defendant possesses all three listed traits before holding him ineligible for relief. Government CA9 Brief 7; *id.*, at 10–11; accord, *e.g.*, Government CA8 Brief 11. Nor is the government alone in this unsurprising understanding: A study involving ordinary Americans found that the largest share of participants understood a sentence tracking paragraph (f)(1)'s structure to trigger ineligibility only if all three conditions are satisfied. See Brief for Thomas R. Lee et al. as *Amici Curiae* 15, 18.

### III

### A

The government disputes none of this evidence about the law's ordinary meaning. Instead, it begins with a theory. Maybe, the government says, there is another "permissible" way to read paragraph (f)(1). *Ante,* at 7; Brief for United States 18, 37. Maybe Congress implicitly wanted a reader to "distribut[e]" the "verb phrase" "does not have" among each subparagraph. *Ante,* at 8–9 (internal quotation marks omitted); Brief for United States 14–18. Maybe, then, we should effectively read the statute to work this way, with deleted words stricken and new ones added in bold:

> (1) the defendant ~~does not have~~ —
>> (A) **does not have** more than 1 criminal history point . . . ;
>> (B) **does not have** a prior 3-point offense . . . ; and
>> (C) **does not have** a prior 2-point violent offense.

Yes, the government's implicit distribution theory requires a reader to delete words before the em dash. Yes, it requires a reader to reinsert them in three different places where they do not appear. But maybe, the government suggests, Congress implicitly intended for a reader to do all that. Even though what it wrote is susceptible to a far more natural construction requiring none of these gymnastics.

That is not how statutory interpretation usually works. Statutes aren't games or puzzles but "instruments of a practical nature, founded on the common business of human life, . . . and fitted for common understandings." 1 J. Story, Commentaries on the Constitution of the United States §451, p. 437 (1833). For that reason, we usually presume that Congress "employed words in their natural sense, and . . . intended what [it] said." *Gibbons* v. *Ogden*, 9 Wheat. 1, 188 (1824). And once we have identified the most natural sense of the law's terms, as we have here, our interpretive task is usually at an end. See, *e.g.*, *Barnhart* v. *Sigmon*

*Coal Co.*, 534 U. S. 438, 461–462 (2002).

The government's implicit distribution theory is so far from the most natural reading of the law that its many and able lawyers didn't even stumble on it until late in the game. In litigation below, the government started by arguing primarily that paragraph (f )(1) "must be read in the disjunctive"—a fancy way of saying that "and" means "or." Government CA8 Brief 4; see *United States* v. *Garcon*, 54 F. 4th 1274, 1280 (CA11 2022) (en banc). In early cases, that was the government's only argument. See, *e.g.*, Sentencing Tr. in No. 3:19–cr–207 (ED Tenn.), ECF Doc. 176, p. 4 ("I think the Department of Justice's position as well as our position here today is . . . that it should be read disjunctively"); see also Tr. of Oral Arg. 103. Only after a resounding loss on that argument, see *United States* v. *Lopez*, 998 F. 3d 431, 435–443 (CA9 2021), did the government shift to its implicit distribution theory, stressing that its new offering does not require courts to "transform" "and" into "or," see Brief for United States 42–43.

The government's implicit distribution theory may be a "convenient litigating position," *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 213 (1988), but it does not come close to respecting the most natural construction of the law. It may have the benefit of leaving "and" alone, but it comes at the cost of rearranging so much else in the statute. One way or another, the government cannot get where it wishes to go without tinkering with the law. And to know that much should be enough to bring this case to a close: "Crimes are supposed to be defined by the legislature, not by clever prosecutors riffing on equivocal language." *Dubin* v. *United States*, 599 U. S. 110, 129–130 (2023) (internal quotation marks and alteration omitted).

B

How does the government reply? It insists that contextual clues support its implicit distribution theory. These

clues are so compelling, it says, any other construction of
the law isn't "plausible" or "possible." *Ante,* at 16, 27; Brief
for United States 18–19. It is a bold claim, not only because
the government overlooks all the evidence of the statute's
meaning outlined above, but also because it overlooks one
piece of contextual evidence after another weighing against
its implicit distribution theory.

Start with this one: The statute before us stands far
afield from classic cases that invite questions about implied
distribution. In everyday speech, the government stresses,
a listener may appreciate the need to "distribut[e]" what
this Court has called "several antecedents" to "several con-
sequents." *Encino Motorcars, LLC* v. *Navarro*, 584 U. S. 79,
87 (2018) (quoting 2A N. Singer & S. Singer, Sutherland
Statutes and Statutory Construction §47:26, p. 448 (rev.
7th ed. 2014) (internal quotation marks omitted)). In its
brief before us, the government leads with this example of
the phenomenon: someone who says, "I sell red, white, and
blue caps." See Brief for United States 14. That statement,
the government observes, contains an ambiguity. One lis-
tener might think that the seller offers caps bearing all
three colors. But another listener might wonder if the seller
implicitly means to "distribute" different colors to different
caps—so that she really means to say she sells red caps, she
sells blue caps, and she sells white caps. Only context, the
government insists, can resolve the ambiguity and reveal
which understanding best reflects the seller's meaning. *Id.*,
at 16.

If context suggests anything, however, it is that this ob-
servation has little to offer when it comes to the statute be-
fore us. The First Step Act does not contain several "ante-
cedents" (many caps, for example) that might or might not
distribute among several "consequents" (say, colors). In-
stead, paragraph (f )(1) speaks of a single person—"the de-
fendant" presently before the sentencing court—who must

not have three specified traits (A, B, and C). And that "singular" construction "tends to avoid the ambiguity" about distribution that a "plural" construction can invite. M. Kirk, Legal Drafting: The Ambiguity of "And" and "Or," 2 Tex. Tech. L. Rev. 235, 239–240 (1971); see also Huddleston, Cambridge Grammar §1.3.1, at 1280–1281.

Drafting experts illustrate the point with this phrase: "charitable and educational institutions." R. Dickerson, The Fundamentals of Legal Drafting §6.2, pp. 109–110 (2d ed. 1986); Kirk, 2 Tex. Tech. L. Rev., at 239–241. The phrase is ambiguous. The multiple "institutions" might distribute across the multiple listed traits to describe both "charitable institutions and educational institutions." Dickerson, Fundamentals of Legal Drafting §6.2, at 110; Kirk, 2 Tex. Tech. L. Rev., at 240. Or the term "institutions" might not distribute, so the phrase describes only institutions that are both charitable and educational. *Id.*, at 240–241. But if there is just a single "institution," any ambiguity dissipates: "A charitable and educational institution" *is* an institution with both traits. The same holds true when a saleswoman offers "the red, white, and blue cap": In that case, a buyer knows with certainty that the seller offers one kind of cap bearing all three colors.

This contextual clue poses the government with a serious problem. When Congress wrote paragraph (f)(1), it employed a singular construction that tends to avoid the ambiguity about distribution that plural constructions invite. The statute before us thus bears no resemblance to the government's lead illustration involving multiple caps and colors. Nor does it bear any resemblance to the government's various illustrations from statutory and constitutional law involving multiple "offenses" that fall into multiple classes, see *ante,* at 11; Brief for United States 17–18 (discussing 34 U. S. C. §20101(f)); multiple "Cases" that meet multiple descriptions, see *ante,* at 8–9; Brief for United States 40 (quot-

ing Art. III, §2, cl. 1); or the many kinds of "Commerce" Congress can regulate, see *ante,* at 9; Brief for United States 39–40 (quoting Art. I, §8, cl. 3).[2]

Sensing the government's difficulty, the Court struggles for an example of its own involving a singular person or thing that does generate an ambiguity about distribution. Eventually, it lands on Eric Carle's story about a caterpillar who "'ate through'" (among so many other things) "'one sausage, one cupcake, and one slice of watermelon.'" *Ante,* at 8; see also *ante,* at 9, n. 3. Mission accomplished: One child might implicitly distribute the phrase "ate through" to each foodstuff, while another might read the list without implicit distribution to mean the caterpillar ate through a "combination" that includes them all. *Ante,* at 9.

But what does that prove? "[T]o acknowledge ambiguity is not to conclude that all interpretations are equally plausible." *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U. S. 49, 57 (1987). And an example of ambiguity about distribution in a children's book does nothing to prove that the federal criminal statute before us is most plausibly read to require implicit distribution. Add some of paragraph (f)(1)'s salient features into the illustration and that much becomes clear. As the story goes, the caterpillar is in the process of becoming a butterfly. So suppose the story said the caterpillar "will remain a caterpillar if he does not eat (A) one sausage, (B) one cupcake, and (C) one slice of watermelon." I suspect most ordinary readers (and children) would have little trouble concluding that the sentence means that the caterpillar will remain a caterpillar unless he eats all three things; one alone will not do.

───────────

[2] Although at first blush "Commerce" might appear to be a singular noun, this term in fact describes "a noncountable abstraction," *Niz-Chavez* v. *Garland*, 593 U. S. 155, 163 (2021), that this Court has said sweeps in "every species of commercial intercourse," *Gibbons* v. *Ogden*, 9 Wheat. 1, 193 (1824).

## C

Here's another problem with the government's theory: If in some contexts a speaker might intend for a listener to distribute words implicitly, the context before us counsels against attributing any such intention to Congress. It does because a careful look at the safety-valve statute reveals that, when Congress wanted to distribute a phrase in this law, it did not leave the matter to implication. It did not depend on the reader's imagination. Instead, Congress distributed phrases expressly.

Twice, in fact. In paragraph (f )(4), Congress took the trouble to distribute expressly the phrase "was not," permitting relief only if "the defendant *was not* an organizer, leader, manager, or supervisor of others . . . and *was not* engaged in a continuing criminal enterprise." (Emphases added.) Likewise, in paragraph (f )(1) itself Congress expressly distributed the phrase "as determined under the sentencing guidelines" three times, in each of subparagraphs (A), (B), and (C). All the contextual evidence before us thus suggests that, in a statute carrying grave criminal consequences, Congress was careful with its words and concerned with clarity. It did not leave ambiguities about distribution to be resolved by implication. Instead, it resolved them expressly, even at the cost of repetition.

Once more, the government's examples only serve to illustrate its problem. It imagines a speaker who says, "'I didn't like his mother and father.'" *Ante,* at 10; Brief for United States 39. The government suggests that a listener would "probably" understand the sentence as implicitly distributing the phrase "I didn't like his," so that it really means, "I didn't like his mother and *I didn't like his* father." *Ante,* at 10 (emphasis added); Brief for United States 39. But as the hedge ("probably") indicates, an ambiguity lurks here. The sentence could also be understood without any distribution to convey the idea that "I didn't like his mother and father" as a couple, even if I liked each individually well

enough. See Huddleston, Cambridge Grammar §2.2.2, at
1298–1299.[3] Only context, the government concedes, can
clarify which meaning is more apt. See *ante,* at 15; Brief
for United States 16. Yet somehow, the government ne-
glects that same message when it comes to the statute be-
fore us—where context reveals that Congress did not leave
questions of distribution to implication but resolved them
expressly.

## D

Context exposes yet another flaw in the government's im-
plicit distribution theory. If, as the government imagines,
Congress was determined to find an "efficient" way to dis-
qualify a defendant bearing any one of the three traits
listed in paragraph (f)(1), *ante,* at 8, 13; see Brief for United
States 18, it had an obvious solution before it: the word
"or." As we have seen, Congress employed exactly that ap-
proach three times in the safety valve: Paragraphs (f)(2),
(f)(3), and (f)(4) all premise disqualification for relief on the
presence of one trait *or* another. See Part II–B, *supra.* In
this way, too, context confirms that, when Congress wanted
to make one trait among many disqualifying, it proceeded
expressly (and often efficiently)—but never by implication.

After disregarding others, the government at least
acknowledges this particular complication for its theory. It
responds this way: Even substituting "or" for "and," it says,
would not "delive[r] us from interpretive controversy."
*Ante,* at 12; Brief for United States 26. It would not because
replacing "and" with "or" in paragraph (f)(1) still would not

—————

[3] Same goes for the government's example "I'm not free on Saturday
and Sunday." *Ante,* at 10; Brief for United States 39. In some contexts,
the sentence might be understood to distribute the phrase "I'm not free
on" and mean "I'm not free on Saturday and *I'm not free on* Sunday." In
others (suppose you were asked for help with a 2-day home renovation
project), it might mean "I'm not free on Saturday and Sunday" as a com-
bination, even if I am free one day or the other. See Huddleston, Cam-
bridge Grammar §2.2.2, at 1298–1299.

answer the question whether a single trait alone is enough
to render a defendant ineligible for relief. *Ante,* at 12; Brief
for United States 26. As evidence of the malleability of the
word "or" in some contexts, the Court cooks up various il-
lustrations involving a hypothetical chef. *Ante,* at 12, n. 5.

It is a remarkable response. At argument, the govern-
ment acknowledged that "or" "might have been a clearer
way to express" that a single trait is disqualifying in para-
graph (f)(1). Tr. of Oral Arg. 98. Below, the government
initially pushed for treating "and" as meaning "or" precisely
because it knew that doing so would mean that a defendant
is ineligible for relief if he has even one of its listed traits.
See *id.*, at 101; Government CA9 Brief 11–13; Government
CA8 Brief 7–8. And everyone, the Court included, concedes
that Congress's use of the word "or" in paragraph (f)(4)
means that a defendant meeting any one of several criteria
is disqualified from relief. *Ante,* at 25. Simply put, "we
wouldn't be sitting here if Congress had used the word 'or'"
in paragraph (f)(1). Tr. of Oral Arg. 97. Whatever ambigu-
ity "or" might carry in other contexts, it carries none in
§3553(f). Throughout the safety valve, Congress used it to
indicate that a single trait among many is disqualifying.[4]

———————

[4]Alternatively, the government suggests, Congress might have used
"and" in paragraph (f)(1) rather than "or" as it did in paragraphs (f)(2)–
(4) because of something to do with the length or format of these provi-
sions. To that end, the government invites us to compare paragraphs
(f)(1) and (f)(4). Tr. of Oral Arg. 64; see also *ante,* at 25. But, as it turns
out, those paragraphs are almost the same length: 49 words and 40
words, respectively. See §§3553(f)(1), (4). Nor can much be made of the
formatting. The main difference is paragraph (f)(1)'s use of an em dash
to set off the listed traits. But even the government has declined to make
much of the em dash, and for good reason. It simply "mark[s] an inter-
ruption in the structure of a sentence," substituting here for a colon. B.
Garner, Modern English Usage 750 (4th ed. 2016). No party before us
suggests that this em dash is so versatile that it can transform an inter-
ruption into an implied distribution. See Brief for United States 38–39
(conceding that an em dash "is neither necessary *nor sufficient* for a dis-
tributive interpretation" (emphasis added)).

Finding the government on its back foot, the Court again comes to its defense, this time by trying to change the rules of play. Perhaps, the Court speculates, Congress's choice of "and" rather than "or" in paragraph (f)(1) was the product of careless drafting. See *ante,* at 11–12. Perhaps, too, those two conjunctions are "versatile" words not entitled to the respect we usually pay Congress's variations in usage—a respect, the Court suggests, that is due only "to terms with some heft and distinctiveness, whose use drafters are likely to keep track of and standardize." *Ante,* at 23, 25.

Consider how far we have now retreated. Lower courts rejected the government's and-means-or argument. In response, the government introduced its implicit distribution theory. Before us, the government stresses that its new theory does not depend on "transform[ing]" "and" into "or." Brief for United States 42; see also *id.*, at 15, 25. At first, the Court seems to proceed on the same premise. See *ante,* at 7–8. But now it reverses course. Resuscitating an argument the government itself has abandoned, the Court contends not just that the terms "and" and "or" *are* interchangeable, but that we need not even rely on our usual rules of interpretation when faced with them.

This argument was a loser below and it should be here. When Congress employs "differing language in . . . two subsections," we start from a presumption that it meant to convey a difference in meaning, not a presumption that it made "a simple mistake in draftsmanship." *Russello* v. *United States*, 464 U. S. 16, 23 (1983). Never, to my knowledge, has this Court suggested that we may turn our back on this approach when conjunctions or other putatively "indistinctive" words are in play. Nor have we deployed that approach for "hefty" words alone—as if we were picking paper towels instead of interpreting statutes. To the contrary, our cases begin (and often end) with the presumption that Congress is careful in all its word choices and afford variations

between terms like "and" and "or" the same respect due others. See, *e.g.*, *United States* v. *Palomar-Santiago*, 593 U. S. 321, 326 (2021) (reversing the lower court for failing to give effect to a statute's use of "the conjunctive 'and'"); *Encino Motorcars*, 584 U. S., at 87 (resting a reading of the relevant statute on "the ordinary, disjunctive meaning of 'or'"); *Loughrin* v. *United States*, 573 U. S. 351, 357 (2014) (rejecting an argument that would "disregard what 'or' customarily means"); *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 338–339 (1979) (similar); *Rumsfeld* v. *Padilla*, 542 U. S. 426, 434 (2004) (giving weight to the federal habeas statute's "consistent use of the definite article").[5]

Nor could the premise latent in the Court's argument be further from the truth. The difference between words like "and" and "or" often cannot be easily dismissed as meaningless when it comes to settling legal rights. Just imagine if the Sixth Amendment gave the accused a "right to a speedy *or* public trial." Rather than getting a both timely and transparent trial, a defendant would be forced to choose which feature he prefers. Because the difference between "and" and "or" so regularly proves dispositive of important legal rights, drafting manuals for legal text from contracts to congressional legislation warn about the need to deploy the terms with care. See, *e.g.*, Senate Office of the Legislative Counsel, Legislative Drafting Manual 64–65 (1997); K. Adams, A Manual of Style for Contract Drafting §§11.9–11.11, p. 211 (3d ed. 2013). And here, of course, the difference between "and" and "or" affects the lives of thousands, see *supra*, at 7—a fact so inconvenient for the Court that the Court says to ignore it as well, see *ante,* at 26.[6]

_____

[5] Even the cases the Court cites, see *ante,* at 23, describe the presumption of meaningful variation without the qualification it now imagines. See *IBP, Inc.* v. *Alvarez*, 546 U. S. 21, 34 (2005); *Wisconsin Central Ltd.* v. *United States*, 585 U. S. 274, 279 (2018).

[6] The Court offers still one more guess, again premised on careless drafting, about why Congress used "and" rather than "or." Maybe, the

IV

So far, things look bleak for the government. Mr. Pulsifer offers a perfectly natural reading of the law. In response, the government offers a theory that it says rises or falls based on context. See *ante,* at 15; Brief for United States 11, 16. Yet, as it turns out, not one but three contextual clues array against its theory.

Unable to muster a convincing response to any of that, the government pivots. Even if its implicit distribution theory suffers so many flaws, the government urges us to adopt it anyway because Mr. Pulsifer's reading of the law would introduce a superfluity into the safety-valve statute. It is a resourceful reply. The government has many. But it, too, falls flat.

A

Without question, the canon against superfluity can be a useful tool when seeking the meaning of a statute. It rests on the same principle as the canon of meaningful variation: the presumption that Congress is a careful drafter and each word it chooses "is there for a reason." *Advocate Health Care Network* v. *Stapleton*, 581 U. S. 468, 477 (2017). But that fact also makes the government's choice to rest its case on the superfluity canon a curious one. As we have seen,

---

Court posits, when Congress amended paragraph (f)(1) in 2018 it failed to notice that it had used "or" when drafting paragraphs (f)(2)–(f)(4) in 1994. *Ante,* at 25–26. Normally, though, we assume "that Congress is aware of existing law when it passes legislation." *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, 32 (1990). And it beggars belief to suppose that Congress didn't bother to review the rest of the safety valve when it amended one of its provisions—particularly when it knew that defendants, prosecutors, and judges would necessarily read all five safety-valve provisions together as part of a single "eligibility checklist." *Ante,* at 24; cf. *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U. S. 49, 57, and n. 2 (1987) (pointing to meaningful variation between the statutory language at issue and other, later enacted statutory provisions to counter the assertion that the choice of language was "a 'careless accident'").

the government's implicit distribution theory depends on the assumption that Congress was *not* a careful drafter. It requires us to assume Congress left a distribution implicit in one section of paragraph (f )(1), even as it made others express elsewhere in paragraphs (f )(1) and (f )(4). It requires us to assume Congress meant for "and" in paragraph (f )(1) to do the same work as "or" in paragraphs (f )(2)–(f )(4). Sometimes, it seems, we are supposed to assume Congress was sloppy, other times careful. The only common thread seems to be what benefits the government in the moment.

Even putting that small irony aside, the government has a bigger problem: Mr. Pulsifer's reading leaves no provision in this statute superfluous. As the government sees it, a defendant who has both the prior 3-point offense required by subparagraph (B), and the 2-point violent offense required by subparagraph (C), will necessarily have more than the 4 criminal history points required by subparagraph (A). Because of this, the government submits, subparagraph (A) has no work to perform on Mr. Pulsifer's reading: "Remove it from the statute, and what is left will make the exact same people eligible (and ineligible) for relief." *Ante,* at 17; Brief for United States 19–20. Only its implicit distribution theory, the government contends, can cure the problem by allowing one subparagraph to "disqualif[y] defendants from relief even when the others would not." *Ante,* at 16; Brief for United States 19–20.

It's a nice argument, but it rests on a faulty premise. As it happens, a defendant who has a 3-point offense under subparagraph (B) and a 2-point violent offense under subparagraph (C) often will *not* have "more than 4 criminal history points . . . under the sentencing guidelines" for purposes of subparagraph (A). And in cases like that, subparagraph (A) performs vital work under Mr. Pulsifer's reading of the law by ensuring that the defendant remains eligible for relief. There is simply no surplus here for the

government's implicit distribution theory to cure.

To appreciate why this is so, consider the sentencing guidelines Congress cross-referenced in subparagraphs (A) through (C). They set forth a two-step process for calculating a defendant's criminal history. At the first step, discussed in §4A1.1 of the guidelines, a judge assigns points to the defendant's prior offenses. Usually, the points correspond to the length of the defendant's previous sentences. So, for example, three points normally attach to an offense carrying a sentence longer than 13 months, two points to an offense with a sentence shorter than that but at least 60 days long, and one point to any other sentence.

At the second step, described in §4A1.2 of the guidelines, a judge then computes the defendant's criminal history. But during this process, a judge doesn't just tote up all the points assigned to each offense. Under a variety of circumstances, the guidelines instruct a judge *not* to count points assigned to one offense or another. Points associated with hitchhiking, public intoxication, and fish and game offenses, for example, "are never counted." §4A1.2(c)(2). Nor are points associated with sentences imposed by a court-martial, a foreign court, or a tribal court. §§4A1.2(g)–(i). The guidelines also instruct judges not to count points associated with offenses of a certain age. So, by way of illustration, if the defendant finished his sentence for a 3-point offense more than 15 years ago, those points are not counted. Likewise, if the defendant finished his sentence for a 2-point offense more than 10 years ago, those points do not count. §§4A1.2(e)(1)–(3). Courts thus perform "a single calculation" of a defendant's criminal history score. *Ante,* at 19, n. 6. But in doing so, they routinely distinguish between the points an offense carries and a defendant's ultimate, countable criminal history points.[7]

————————

[7] See, *e.g.*, *United States* v. *Nesby*, 2020 WL 4933657, *2 (SD Ill., Aug. 24, 2020) (defendant had "accumulated 34 criminal history points, many

GORSUCH, J., dissenting

Now return to subparagraph (A).  It provides that the defendant must not have "more than 4 criminal history points, *excluding any criminal history points resulting from a 1-point offense*, as determined under the sentencing guidelines."  §3553(f)(1)(A) (emphasis added).  As the italicized language demonstrates, when adopting the First Step Act Congress fully appreciated the distinction between what points an offense carries and whether those points contribute to a defendant's criminal history score.  And because of that very distinction, it *is* possible for a defendant to have a prior 3-point offense and a prior 2-point violent offense without having more than 4 criminal history points.  Most obviously, as Chief Judge Pryor, former Acting Chair of the Sentencing Commission, has observed, a defendant may have a 3-point offense and a 2-point violent offense but both offenses are so old that he scores no criminal history points at all.  See USSG §§4A1.2(e)(1)–(3); *Garcon*, 54 F. 4th, at 1281.  As Judge Wood has noted, there are a variety of other situations as well in which a defendant will have both a 3-point offense and a 2-point violent offense but still not have more than four criminal history points.  See *United States* v. *Pace*, 48 F. 4th 741, 763–764 (CA7 2022) (dissenting opinion).

To know that is to know no superfluity problem exists—and thus no need to resort to the government's implicit distribution theory to solve it.  On Mr. Pulsifer's reading of the

––––––––

of which were not countable in his criminal history calculation"); *Jones* v. *United States*, 2019 WL 365715, *3 (D NJ, Jan. 30, 2019) ("The sentencing guidelines only permit a maximum of four one-point offenses to count toward a defendant's criminal history"); *United States* v. *Johnson*, 2023 WL 4944732, *1 (WD Pa., Aug. 3, 2023) (same); *Dameron* v. *United States*, 2007 WL 893050, *4, n. 1 (ND Ohio, Mar. 21, 2007) ("The criminal convictions above produce a subtotal criminal history score of 10, and it is noted that 3 of the defendant's 7 points under U.S.S.G. §4A1.1(c) were not countable"); *United States* v. *Dalton*, 2010 WL 455239, *3 (D SC, Feb. 2, 2010) (noting 45 uncountable criminal history points "in addition to the fifteen countable criminal history points").

law, a court applying subparagraph (A) will consult the sentencing guidelines' methodology for scoring criminal history points set forth in §4A1.2. In doing so, the court may find that, while the defendant has a prior 3-point offense and a prior 2-point violent offense for purposes of subparagraphs (B) and (C), one or another is too old or suffers from some other flaw so that he does not have more than four criminal history points. In all these cases, subparagraph (A) does significant work by making clear that, despite having a prior 3-point offense and a prior 2-point violent offense, the defendant remains eligible for relief. See *Garcon*, 54 F. 4th, at 1281–1282; *Pace*, 48 F. 4th, at 763 (opinion of Wood, J.).

## B

The government does not contest the central observation that defeats its superfluity argument. It *admits* that certain past offenses "ad[d] zero points to [a defendant's] criminal-history score." Brief for United States 32, n. 2; *ante,* at 17. So what exactly is the problem here?

To complain about a superfluity problem, it turns out the government must create one. It does so this way. As written, subparagraphs (B) and (C) require a sentencing court to ask whether the defendant "ha[s]" a "3-point offense, as determined under the sentencing guidelines," and "a 2-point violent offense, as determined under the sentencing guidelines." But, the government suggests, we should read those provisions differently. We should read them to require a sentencing court to ask the further question whether the defendant's offenses *also* score criminal history points. As the government candidly admits, its superfluity argument depends on reading subparagraphs (B) and (C) as "car[ing] only about offenses that *do* score . . . criminal-history points." Brief for United States 28–29; *ante,* at 19–20. Only then might subparagraph (A) be left without work to perform, for indeed an offense that scores three criminal history points under subparagraph (B) and a violent offense

that scores two criminal history points under subparagraph (C) will always score more than four criminal history points under subparagraph (A).

Put plainly, for the government's superfluity argument to gain any traction, we must read *still more* words into the First Step Act, construing it now this way:

> (1) the defendant ~~does not have~~ —
> (A) **does not have** more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
> (B) **does not have** a prior 3-point offense **that scores 3 criminal history points,** as determined under the sentencing guidelines; and
> (C) **does not have** a prior 2-point violent offense **that scores 2 criminal history points**, as determined under the sentencing guidelines.

It is one more remarkable request. Last I heard, the canon *against* assuming Congress has adopted superfluous words is not a license for judges to *create* a superfluity by inserting new words into a law. Let alone do so simply to help the government make its implicit distribution theory seem just a little less implausible.

## V

At this stage, the government withdraws to its final redoubt: a policy argument. In the government's view, the only "function" Congress gave paragraph (f)(1) was the task of separating "more from less serious prior offenders." *Ante,* at 21–22; Brief for United States 21. Affording the statute's terms their ordinary meaning, the government asserts, would not allow the law to perform that "purpose" adequately. Brief for United States 20. By contrast, its implicit distribution theory would enable the law to fulfill its intended "role" "unerringly." *Ante,* at 21, 22, n. 7; Brief for

United States 21.

If this policy argument sounds familiar, it is because we have time and again rejected ones just like it. We do not presume that a law performs only one "function" or "role," but recognize that almost every piece of legislation seeks to serve many competing purposes. See *Luna Perez* v. *Sturgis Public Schools*, 598 U. S. 142, 150 (2023); *Barnhart*, 534 U. S., at 461; *Chicago* v. *Environmental Defense Fund*, 511 U. S. 328, 339 (1994). We do not suppose that a law pursues any of those competing purposes to its logical end, acknowledging instead that almost every law is the product of compromise. *Luna Perez*, 598 U. S., at 150. And we do not displace ordinary statutory terms with judicial "speculation as to Congress['s] intent," *Magwood* v. *Patterson*, 561 U. S. 320, 334 (2010), because the American people have consented to be governed by the written laws their elected representatives adopt, not by the conjecture of others, see *United States* v. *Bass*, 404 U. S. 336, 348 (1971). For all these reasons and more, "it is quite mistaken to assume," as the government does, "that whatever might appear to further the statute's primary objective must be the law." *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. 79, 89 (2017) (internal quotation marks and alterations omitted).

Perhaps recalling our frequent admonition that policy talk cannot overcome plain text, the government tries a bit of rebranding. Although it refers occasionally to the First Step Act's "purpose," Brief for United States 20–21, 34, 48, for the most part it frames its argument in terms of rationality. When we measure the competing interpretations before us against how well they perform the statute's only job, the government insists, we will find that the law's ordinary meaning invites "arbitrar[y]" results and "nonsensical" implications. *Id.*, at 22, 34, 36, 48. The Court buys into this thinly disguised policy appeal, see *ante,* at 20–22, and n. 7, even as it forcefully (and without a trace of irony) faults Mr. Pulsifer for appealing to statutory "purpose," *ante,* at 26.

New framing or old, however, we have no business entertaining the government's ramshackle argument.

If anything, the government's attempt at rebranding only makes matters worse for it. When a statute produces a truly irrational result, we have a doctrine to deal with the dilemma: absurdity. In narrow circumstances, a simple and "eas[ily]" fixed statutory error that "no reasonable person could intend" may be amenable to judicial correction under this Court's traditional absurdity doctrine. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 234, 237 (2012); Story, Commentaries §427, at 411. It is a highly demanding doctrine—deliberately so, for judges have no license to rewrite a law's terms just because they happen to think different ones more sensible. And, tellingly, no one thinks this law produces anything like an absurd result that might call for a judicial remedy. In fact, the government affirmatively *disavows* any reliance on absurdity doctrine. See Brief for United States 36. Instead, it only gestures vaguely in the direction of "nonsensical" results and asks us to run with the idea. As if we could tinker with Congress's work on the basis of some newly fashioned "absurdity-lite" doctrine.

There is a reason why the government does not attempt an argument actually grounded on absurdity doctrine. Its core complaint is that the natural reading of the law does not, with sufficient precision, separate "more from less serious prior offenders." *Ante,* at 22; Brief for United States 21. But, of necessity, Congress often deploys "standardized formula[s]" or checklists, like the one found in paragraph (f)(1), that "are by their nature over- and under-inclusive." *Ransom* v. *FIA Card Services, N. A.*, 562 U. S. 61, 78 (2011). And because Congress may rationally prefer these approaches for various reasons, including their ease of administration, this Court has long held that we will not second-guess them merely because they may produce some "oddit[ies]" or "anomalies." *Ibid.*; see *Rodriguez* v. *United*

*States*, 480 U. S. 522, 526 (1987) (*per curiam*) ("Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice").[8]

If, as the government supposes, a seemingly anomalous result alone could unsettle a statute, it would face its own troubles, too. Under its implicit distribution theory, an individual who previously committed a nonviolent offense and received a sentence longer than 13 months (*i.e.*, a 3-point offense) is categorically ineligible for relief. Meanwhile, an individual who committed the same crime but received a sentence equal to or one day less than 13 months (*i.e.*, a 2-point offense) thanks to a slightly more lenient sentencing judge remains eligible for relief. Rather than "unerringly" enable the safety valve to "separat[e] more serious prior offenders from less serious ones," *ante,* at 21, the government's approach thus leaves much to happenstance and luck—an anomalous result indeed.

Return, then, to our *actual* absurdity doctrine and consider the government's argument in its light. The government worries that respecting paragraph (f)(1) as written would treat "more serious" offenders too leniently. But in doing so, the government ignores what follows. A defendant who satisfies paragraph (f)(1) must still go on to satisfy paragraphs (f)(2)–(5). And those provisions collectively operate to deny relief to virtually anyone whose current offense involves any trace of violence.

Even if a "more serious" offender could somehow thread

_____

[8] In a footnote, the Court concedes that *both* sides read paragraph (f)(1) as announcing a standardized formula or checklist that inevitably produces some "anomalies." *Ante,* at 22, n. 7. Yet the Court proceeds to reject Mr. Pulsifer's reading. Why? Only because it thinks that interpretation is just worse at performing the paragraph's "role." *Ibid.* Once more, the Court resorts to policy and purpose to escape its interpretive dilemma. And once more, it fails to heed its own advice to Mr. Pulsifer that one "interpretation is not better" than another "just because it would go further" in advancing some view about the law's "role." *Ante,* at 26.

his way through all those needles, too, another would await. The safety valve instructs a sentencing court to fashion a sentence "pursuant to [the] guidelines." §3553(f). The guidelines expressly account for a defendant's criminal history, and few would accuse them of leniency toward those with a history of serious offenses. In fact, defendants with significant criminal histories often wind up with a recommended guidelines sentence *higher* than the otherwise-applicable mandatory minimum. See Brief for National Association of Federal Defenders as *Amicus Curiae* 7–8. Sentencing courts may have the discretion to vary or depart from the guidelines' recommended ranges. But Congress could have rationally trusted courts to exercise that discretion with an appreciation for the fact that individuals with serious criminal histories—such as the government's hypothetical defendant with many prior three-point violent offenses, see *ante,* at 21–22; Brief for United States 23—warrant equally serious sentences. So, looking to the law as a whole (as we must) and appreciating that Congress often legislates using standardized formulas or checklists that may be over- and under-inclusive (again, as we must), there is nothing approaching an absurdity that might license us to rewrite the First Step Act.[9]

In a final effort to bolster the government's case, the Court professes an entirely different concern of its own. It claims to worry that the natural reading of the law would

---

[9] Nor is it clear that a "more serious" offender could even make it past paragraph (f)(1) to begin with. The government seems to worry that a 3-point violent offense would not count as a 2-point violent offense under subparagraph (C), thus allowing some violent offenders to satisfy paragraph (f)(1) under its most natural construction. *Ante,* at 21–22; Brief for United States 22–23. But, while Mr. Pulsifer has not pursued the point in his case and so it is not at issue before us, some lower courts have held that an ordinary person would read subparagraph (C)'s reference to a 2-point violent offense to embrace a violent offense carrying *at least* that many points. See, *e.g., Lopez,* 998 F. 3d, at 440–441, n. 10; see also *Pace,* 48 F. 4th, at 765 (Wood, J., dissenting).

sometimes be too *harsh* in operation. Holding a defendant ineligible for safety-valve relief based on offenses that score "zero points," we are told, would be "out-of-sync" with the law's purpose. *Ante,* at 20. But there is nothing absurd here either. Subparagraph (A) provides that defendants are eligible for relief as long as their past convictions do not yield more than four criminal history points—a calculation that, as we have seen, does not include points associated with old crimes and certain other offenses. Subparagraphs (B) and (C) provide that other defendants with more than four criminal history points are eligible for relief too as long as they don't have anywhere in their past a serious (3-point) offense and a weighty (2-point) violent offense—even if those offenses are (say) too old to contribute to their criminal history scores. So whatever unfairness the Court may perceive in one part of the safety valve (here, subparagraphs (B) and (C)) is diminished when considered in light of another (here, subparagraph (A)). Some might prefer a different arrangement, but the one Congress ordained is hardly absurd.

If any law demonstrates the wisdom of our usual rules against elevating policy appeals over plain text, it is this one. Under the ordinary meaning of the statute, it is possible some "more serious" offenders may make it past paragraph (f)(1), and perhaps even end up receiving an individualized sentence under guidelines that hardly exhibit solicitude for those with "more serious" criminal histories. Under the implicit distribution theory, in contrast, the availability of individualized sentencing may depend on the happenstance of one extra day in prison. In the end, attempting to pick between these two outcomes proves nothing more than the futility of the exercise. However artfully the government frames its dissatisfaction with the text of the statute, we have neither the institutional competence nor the constitutional mandate "to assess the relative merits of different approaches" Congress could have taken.

*Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.*, 530 U. S. 1, 13 (2000). Our role is a more modest one: "[W]hen the statute's language is plain" and "the disposition required by the text is not absurd," "the sole function of the courts . . . is to enforce it according to its terms." *Id.*, at 6 (internal quotation marks omitted). Because that is undoubtedly the case here, we must apply the safety valve as written.

## VI

As I see it, the government hasn't come close to supplying a lawful basis for departing from the law's ordinary meaning. Suppose, though, at the end of this long march through its inventive theories you remain unsure. Suppose you are left with a reasonable doubt about whether Mr. Pulsifer or the government has the better reading of the law. In circumstances like that, another rule of construction supplies an answer. It is lenity.

The rule of lenity "is perhaps not much less old than construction itself." *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820) (Marshall, C. J.); see *Wooden* v. *United States*, 595 U. S. 360, 388 (2022) (GORSUCH, J., concurring in judgment) (citing *The Adventure*, 1 F. Cas. 202, 204 (No. 93) (CC Va. 1812) (Marshall, C. J.)). It requires courts to interpret ambiguous "penal laws," including those concerning sentencing, in favor of liberty, not punishment. *Wiltberger*, 5 Wheat., at 95; *United States* v. *Batchelder*, 442 U. S. 114, 121 (1979); *Bifulco* v. *United States*, 447 U. S. 381, 387 (1980).

This rule enforces weighty constitutional values. Courts construe ambiguous penal laws with lenity because a free nation operates against a background presumption of individual liberty. See *Wooden*, 595 U. S., at 391–392 (opinion of GORSUCH, J.). We resolve doubts about a criminal law's reach in favor of lenity, too, because in our federal government only the people's elected representatives, not their

judges, are vested with the power to "define a crime, and ordain its punishment." *Wiltberger*, 5 Wheat., at 95; accord, *Crandon* v. *United States*, 494 U. S. 152, 158 (1990); *Wooden*, 595 U. S., at 391–392 (opinion of GORSUCH, J.).

Lenity protects vital due process interests, as well, by ensuring individuals fair notice of the consequences of their actions. *United States* v. *Lanier*, 520 U. S. 259, 266 (1997); see *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931); *Wooden*, 595 U. S., at 389–391 (opinion of GORSUCH, J.). And lenity performs still further work, guarding against the possibility that judges might condemn unpopular individuals to punishment on the strength of their own views about common sense, good public policy, or "no more than a guess as to what Congress intended." *Ladner* v. *United States*, 358 U. S. 169, 178 (1958).

So suppose you thought a reasonable doubt remained about how best to construe the First Step Act. In those circumstances, the answer cannot be to adopt an interpretation that restricts safety-valve relief to thousands more individuals. The only permissible answer is one that favors liberty.

## VII

Today, the Court does not hedge its doubts in favor of liberty. Instead, it endorses the government's implicit distribution theory and elevates it over the law's ordinary and most natural meaning.

It is a regrettable choice that requires us to abandon one principle of statutory interpretation after another. We must read words into the law; we must delete others. We must ignore Congress's use of a construction that tends to avoid, not invite, questions about implicit distribution. We must dismiss Congress's variations in usage as sloppy mistakes. Never mind that Congress distributed phrases expressly when it wanted them to repeat in the safety valve.

Never mind that Congress used "or" when it sought an efficient way to hinge eligibility for relief based on a single characteristic. We must then read even more words yet into the law to manufacture a superfluity problem that does not exist. We must elevate unexpressed congressional purposes over statutory text. Finally, rather than resolve any reasonable doubt about statutory meaning in favor of the individual, we must prefer a more punitive theory the government only recently engineered.

Today, the Court indulges each of these moves. All to what end? To deny some individuals a chance—just a chance—at relief from mandatory minimums and a sentence that fits them and their circumstances. It is a chance Congress promised in the First Step Act, and it is a promise this Court should have honored. Respectfully, I dissent.